THE KANKAKEE COUNTY BOARD OF REVIEW, Plaintiff-Appellant, v. PROPERTY TAX APPEAL BOARD *et al.*, Defendants-Appellees.

Third District   No. 3—87—0068

Opinion filed December 4, 1987.

William Herzog, State's Attorney, of Kankakee (John X. Breslin, of State's Attorneys Appellate Prosecutor's Office, of counsel), for appellant.

Neil F. Hartigan, Attorney General, of Springfield (Bret A. Rappaport, Assistant Attorney General, of Chicago, of counsel), for appellee Property Tax Appeal Board.

Cappetta & Schadle, of Oakbrook Terrace, and John L. O'Brien, of Herschbach, Tracy, Johnson, Bertani & Wilson, of Joliet (Ronald Schadle, of counsel), for appellees Riverwoods Associates and American National Bank & Trust Company.

PRESIDING JUSTICE BARRY delivered the opinion of the court:

The Kankakee County board of review appeals from judgment of the circuit court of Kankakee County affirming a decision of the State Property Tax Appeal Board (PTAB) which found that the fair market value of the subject property, known as the Riverwoods Apartments, was $2,325,000 as of January 1, 1984. The only issue presented for our consideration is whether a government rent subsidy should have been considered in determining the property's fair market value.

Riverwoods Apartments is a nine-story, 125-unit building located at 300 River Street in Kankakee, Illinois. The building is owned by Riverwoods Associates, a limited partnership. Occupancy is limited to elderly residents. Their rent, it appears, is subsidized pursuant to an agreement with the Illinois Housing Development Authority; however, the subsidy agreement does not appear in the record before us. Construction was completed on the building on September 28, 1983.

At a hearing before the PTAB, both Riverwoods Associates, as appellant, and the county board of review, as appellee, presented appraisal reports in support of their respective positions. In addition, Riverwoods Associates presented testimony of its appraiser, Mr. Nicholas Muros, a certified assessment evaluator.

Muros applied three accepted methods of valuation in arriving at his determination of the property's fair market value—the cost approach (land value plus depreciated reproduction cost of improvements); the income approach (capitalization of net operating income); and the market data approach (comparison of prices actually paid, asked or offered for similar properties). Muros concluded that the income approach yielded the most pertinent data, and his conclusion of the fair market value—$2,325,000—coincides with his determination of value using the income approach. In this regard, Muros observed that in 1984 Riverwoods Associates received approximately $736 per month per apartment pursuant to the Federal government subsidy agreement, of which an average of only $123 per month was paid by the tenants. Because of the broad range between these two figures, Muros explained, he did not consider the government subsidy agreement(s) and its (their) effect on income, interest or rent restrictions when he applied the income approach. Instead, Muros surveyed apart-

ment rents of nonsubsidized units in the Kankakee area, and arrived at a "gross potential rent" figure of $457,800. Muros adjusted his "gross potential rent" for vacancy and collection losses and for other income to $447,100, which figure Muros labeled "effective gross income." Similarly, Muros "stabilized" the property's expenses by applying expense to income ratios developed by the Institute of Real Estate Management Apartment Survey. By this method, he arrived at a "total expense" figure of $172,600. Then, Muros capitalized the "net operating income" of $274,500 at the rate of 11.8%, thereby arriving at a value of $2,326,271, which he rounded down to $2,325,000. Muros' reproduction cost and market data approaches yielded values of $2,308,000 and $2,300,000, respectively.

Mr. W. B. Stoutamoyer, member of the Appraisal Institute, prepared the appraisal submitted by the county board of review. He used the same three approaches employed by Muros. However, it appears that in applying the income approach, Stoutamoyer considered comparable subsidized properties in the areas of Kankakee and central Illinois, and arrived at "economic" rents of $520 per month for the subject property's 124 one-bedroom units and $670 per month for the single two-bedroom unit. In this manner, Stoutamoyer determined that the "total potential annual gross income" was $781,800, from which he deducted for vacancy and credit loss and added "other income" and arrived at an "effective gross income" of $776,482. Stoutamoyer derived expenses of $156,263, and then capitalized the "net income before recapture" of $620,219 at the rate of 10.5%, and arrived at a value of $5,906,848, which he rounded down to $5,900,000.

The market data approach, which Stoutamoyer considered to be the most "dangerous" under the circumstances, yielded a value of $5,504,000. It should be noted that none of the comparable properties considered by Stoutamoyer in the market data approach were subsidized housing.

In computing the property's value under the cost approach, Stoutamoyer used the Marshall Valuation Service to arrive at a base cost of $53.81 per square foot, to which he applied a local multiplier of 1.09 and then added $2.49 per square foot for extra improvements to the property. The building's square footage of 103,824 was then multiplied by $61.14 for a "total cost new" of $6,347,799. From this, Stoutamoyer deducted depreciation and added the land value and arrived at an indicated value of $6,665,875. Stoutamoyer considered that the cost method should be accorded greatest credence, primarily because of the newness of the building and the lack of significant de-

preciation. He concluded, accordingly, that the fair market value of the subject property as of February 21, 1985, was $6,665,875.

The trial court's approval of the PTAB's adoption of Muros' assessment, it appears, was based primarily upon its analysis of our supreme court's opinion in *Springfield Marine Bank v. Property Tax Appeal Board* (1970), 44 Ill. 2d 428, 431, 256 N.E.2d 334, 336. In *Springfield Marine*, the court declared that for tax assessment purposes a property's actual, or contractual, rental income should be disregarded where the property is encumbered by a long-term lease which does not reflect the property's "capacity for earning income." In this case, the trial court acknowledged the distinction between the "encumbrance" in *Springfield Marine* and the "favorable" lease in this case, but concluded that the doctrine of *Springfield Marine* should apply here so as not to treat the taxpayer "on different terms from the taxing body."

In this appeal, the owners direct our attention to two decisions from foreign jurisdictions in support of their contention that the value of a government subsidy is irrelevant for purposes of real property assessment. (*Canton Towers, Ltd. v. Board of Revision* (1983), 3 Ohio St. 3d 4, 444 N.E.2d 1027; *Congresshills Apartments v. Township of Ypsilanti* (1983), 128 Mich. App. 279, 341 N.W.2d 121.) We have reviewed these decisions, as well as *Springfield Marine* and several other cases from foreign jurisdictions, and we conclude that *Springfield Marine* does not justify the valuation approach adopted by the PTAB on the facts here presented.

In *Springfield Marine*, the taxpayer's predecessor in interest had subjected the property in question to long-term leases in 1952 which had approximately 10 years yet to run at the time of the court's decision in 1970. The evidence before the court further established that the contractual rent on the leases was "substantially below that which could *** be obtained under new leases." (*Springfield Marine*, 44 Ill. 2d at 429, 256 N.E.2d at 335.) Moreover, during the years in which the leasehold had been in effect, the value of the property had "advanced significantly." The PTAB accepted the value of the real estate as determined by the taxpayer's appraiser, but declined to reduce the assessed value to account for the unfavorable leases. On review, the trial court adopted the taxpayer's position that the leases affected the "fair cash value" of the property, found that the PTAB's determination was contrary to the manifest weight of the evidence and reduced the assessed valuation accordingly.

The supreme court reversed. The court defined "fair cash value" as "the value of the 'tract or lot of real property' which is assessed,

rather than the value of the interest presently held by the owner." The court continued, "In determining the value of the property, rental income may of course be a relevant factor. [Citation.] However, it cannot be the controlling factor, particularly where it is admittedly misleading as to the fair cash value of the property involved. *** [I]t is the capacity for earning income, rather than the income actually derived, which reflects 'fair cash value' for taxation purposes." (*Springfield Marine*, 44 Ill. 2d at 430-31, 256 N.E.2d at 336.) The court reinstated the higher assessment approved by the PTAB.

*Canton Towers* is a six-to-two split decision in which the supreme court of Ohio upheld a decision of its Board of Tax Appeals in a case substantially similar to this case. There, taxpayer's appraiser had used "economic" rent in his determination of fair market value using the income approach, and the taxing authority's appraiser had used "actual fixed rent" which resulted in a substantially higher valuation. Both appraisers agreed that the cost approach was not appropriate, considering the government subsidies involved in the construction and maintenance of the apartment complex. The final estimation of value by both appraisers was equal to the figure each reached using the capitalized income approach. On review, the majority noted that the Ohio Administrative Code specifically authorizes consideration of "economic" rent and computation of interest and capitalization rates from "market data allowing for current returns on mortgages and equities" with the income approach to valuation. (*Canton Towers*, 3 Ohio St. 3d at 7, 444 N.E.2d at 1030.) The majority, accordingly, approved the tax appeal board's adoption of the appraisal using the "economic" rent.

The dissenting justices concluded that "economic" rent was not a fair indicator of "true value in money" because the building was unique to its area and there was, therefore, no "comparable space" from which to calculate "economic" rent. The relevant facts for valuing the subsidized housing project under the income approach to valuation, the dissenters concluded, were the contract rent and the actual mortgage terms of the subject property. *Canton Towers*, 3 Ohio St. 3d at 9, 444 N.E.2d at 1032. See also *Executive Square Ltd. Partnership v. Board of Tax Review* (1987), 11 Conn. App. 566, 528 A.2d 409 (approving use of actual rental income of subsidized housing where circumstances surrounding the property lead to reasonable conclusion that there is no market of nonsubsidized housing comparable to the subject subsidized property).

In *Congresshills Apartments v. Township of Ypsilanti*, the Michigan Court of Appeals found error in the tax tribunal's use of reduced

capitalization rates which effectively valued a Federal interest subsidy. On remand, the tax tribunal was directed to compute tax liability on the basis of "true cash values" as derived from applying a market capitalization rate to the property's net income based on actual income and actual expenses. (*Congresshills Apartments v. Township of Ypsilanti*, 128 Mich. App. at 291, 341 N.W.2d at 127.) This approach was recently reaffirmed by the Michigan Court of Appeals. *Pinelake Housing Cooperative v. City of Ann Arbor* (1987), 159 Mich. App. 208, 406 N.W.2d 832.

■■ ■ Returning to the case on appeal, we initially note that this court's function is to determine whether the PTAB acted in accordance with its statutory powers and whether there is evidence to support its decision. (*Hall v. Illinois Property Tax Appeal Board* (1981), 98 Ill. App. 3d 824, 424 N.E.2d 375.) An assessment that is based upon an improper method of valuation is subject to reversal on appeal. *Board of Review v. Illinois Property Tax Appeal Board* (1982), 104 Ill. App. 3d 859, 433 N.E.2d 692.

■■ Unlike the court in *Canton Towers* (*Canton Towers, Ltd. v. Board of Revision* (1983), 3 Ohio St. 3d 4, 444 N.E.2d 1027), we find no specific legislative guidance for determining what appraisal techniques should be employed in the income approach to valuation. It would appear that both parties' appraisers agree that the income approach is a reliable indicator of the property's fair market value, although they part company as to whether most credence should be placed in that method. The appraisers also appear to agree that the property's present use is its highest and best use. We can determine from the record on appeal that the subject property is unique to its area. Under the circumstances, neither the cost replacement approach nor the market approach is particularly enlightening in determining fair market value. Therefore, we find no error in the PTAB's adoption of the income approach as the most reliable method in general, and we will confine the balance of our discussion to the application of that method to the subsidized building at issue.

■■ ■ "Economic" rent, "restricted" rents actually paid by the tenants, and "contract" rents actually received by the owner are all entitled to some consideration in the income approach, although no one of these amounts may be controlling. Determining what the property would bring at a voluntary sale between an owner ready, willing and able to sell but not compelled to do so and an equally ready, willing and able buyer who is not forced to buy also requires that any restrictions imposed on the property by force of the subsidy agreement(s) be considered in weighing the foregoing three forms of rent.

(*In re Johnstown Associates* (1981), 494 Pa. 433, 431 A.2d 932.) Certainly, "economic" rent is an important factor in evaluating whether contract rent is so misleading as to the fair cash value of the property that actual gross income and expenses cannot be considered representative of the true earning capacity of the property. (See *Springfield Marine Bank v. Property Tax Appeal Board* (1970), 44 Ill. 2d 428, 256 N.E.2d 334.) By definition, "economic" rent is "the amount a typical lessee should be willing to pay for the right to use and occupy the premises for a stated period." (*Nassif v. Board of Supervisors* (1986), 231 Va. 472, ___, 345 S.E.2d 520, 524.) It may be derived by analyzing the specific property being appraised with reference to "comparable" properties.

■ In this case, it is not at all clear from the record before us that the properties considered by the taxpayer's appraiser were "comparable" to Riverwoods Apartments. Nor can it be said that the property's "economic" rent, determined with reference only to nonsubsidized apartment buildings, truly reflects the subject property's capacity for earning income. Neither the report of the county board's appraiser nor the report or testimony of the taxpayer's appraiser sheds any light on the subsidy agreement(s) and any restrictions imposed thereby. Whether the property is "encumbered" by a net favorable or a net unfavorable rental arrangement cannot be determined on the basis of the record before us. Thus, we find no sound basis for the PTAB's adoption of Muros' appraisal which calculated "economic" rent in total disregard of contract rent or any of the subsidy aspects of this property.

■ As stated in *In re Johnstown Associates*, adoption of a method of appraisal that ignores the subsidized nature of a project such as Riverwoods Apartments and considers only nonsubsidized apartment buildings in assessing the project's value "would amount to a judicially-mandated project subsidy by local government, beyond that which legislative policy has established." (*In re Johnstown Associates*, 494 Pa. at 438, 431 A.2d at 934.) In Illinois, as well, we find no specific legislative intent to further subsidize low-rent, State and/ or federally subsidized housing projects. In our opinion, the fair market value of Riverwoods Apartments cannot be fairly ascertained without some consideration of its subsidy aspects, since such real aspects of the property would unquestionably be given consideration by the hypothetical willing and able seller and buyer. To the extent that the subsidy agreement(s) affects the property's true capacity for earning income, it (they) cannot be ignored in the assessment of value.

In sum, we conclude that the PTAB erred as a matter of law in

accepting a valuation approach that totally disregarded the subsidy aspects of the Riverwoods Apartments. Accordingly, we remand this cause for further proceedings consistent with the views expressed herein.

Reversed; cause remanded.

STOUDER and SCOTT, JJ., concur.