544 So.2d 1356 (1989)
REBELWOOD, LTD., a Mississippi Limited Partnership
v.
HINDS COUNTY, Mississippi, and City of Jackson, Mississippi.
No. 58138.
Supreme Court of Mississippi.
May 3, 1989.
Rehearing Denied June 28, 1989.
*1358 Shane F. Langston, Holcomb, Dunbar, Connell, Chaffin & Willard, Watkins, Ludlam & Stennis, Jackson, for appellants.
Natie P. Caraway, Edward C. Cohen, Wise, Carter, Child & Caraway, Jackson, for appellee.
Before ROY NOBLE LEE, C.J., and ROBERTSON and ANDERSON, JJ.
ROBERTSON, Justice, for the Court:

I.
This is a dispute over the assessed value placed upon a federally subsidized low-income housing complex. Our question is whether the public assessor, when making such an assessment for purposes of ad valorem taxation, may consider enhancements to value flowing from benefits enjoyed by the property in the form of various federal subsidies. Because our law mandates that property be valued and assessed according to its true value, we answer in the affirmative.

II.

A.
This appeal concerns protests filed by Rebelwood, Ltd., a Mississippi limited partnership (hereinafter "Taxpayer"[1]). Taxpayer's managing general partner is Das A. Borden and Company, an Alabama corporation. Taxpayer is the owner of a 161-unit, multi-family complex of apartments known as Rebelwood and located in Jackson. Taxpayer makes complaint against the City of Jackson and Hinds County, Mississippi, regarding the true value and assessed value assigned Taxpayer's property for two consecutive years: 1984 and 1985. Rebelwood is Class II real property[2] which by law is assessed at fifteen percent of true value. Miss. Const. Art. 4, § 112 (1890, as amended); Miss. Code Ann. § 27-35-4(2) (Supp. 1988). Both the County and the City have for those years assigned Rebelwood a true value of $4,044,950.00 and an assessed value of $606,740.00. The *1359 two protests were consolidated for trial in the Circuit Court of Hinds County.[3]
The bottom line is taxes. If, as the public assessors maintain, the value of federal benefits enjoyed by Rebelwood are included in the estimate of Rebelwood's true value, Taxpayer for 1984 owes taxes as follows:

 City of Jackson $45,202.00
 Hinds County $15,248.00

If, as Taxpayer maintains, Rebelwood is assessed as a free market apartment complex and the federal subsidy program ignored, Taxpayer's 1984 tax bills are

 City of Jackson $30,371.00
 Hinds County $10,245.00

The record does not reflect the 1985 tax differentials, although we assume they are similarly proportioned.

B.
Rebelwood was completed in 1981. As a result of federal participation under the National Housing Act, 12 U.S.C. § 1715l(d)(4), Taxpayer was able to finance the cost of construction at a 7 1/2% mortgage rate. In addition to this mortgage subsidy, Taxpayer operates Rebelwood under a housing assistance program authorized by Section 8 of the Housing Act of 1937. 42 U.S.C. § 1437f. This program is managed by the U.S. Department of Housing and Urban Development (HUD) and provides housing for elderly and low-income people.
The federal assistance program begins when a private developer files an application with HUD in which the developer forecasts the replacement costs of the building, proposed "contract rent", and projected expenses necessary for operation and maintenance. "Contract rent" is defined under HUD regulations as the total amount of rent specified in the developer's contract with HUD and is comprised of (a) the actual rent paid by the tenant and (b) the housing assistance subsidy paid by the government. 24 C.F.R. § 880.201 (1988). The amount of the contract rent varies depending on the cost of construction, projected operation expenses, and mortgage expenses. 24 C.F.R. § 880.308(a)(8) (1988). The contract rent may exceed what HUD has determined to be the neighborhood's "fair market rent" by as much as twenty percent. 24 C.F.R. § 880.203 and § 880.204(b)(1)(ii)(B) (1988).
The tenants who occupy such subsidized housing pay as rent a percentage of their income, not to exceed thirty percent. 24 C.F.R. § 813.107 (1988). The difference between the rent actually paid by the tenant and the "contract rent" as contained in the developer's application is subsidized by the federal government. In most instances, the contract rent exceeds rents paid by similarly situated tenants in the vicinity of the development. One motivation for investing in apartments participating in this subsidized housing program is the rather favorable tax treatment generated by the depreciation schedules permitted under federal tax law.
These benefits are of considerable value. In exchange therefor, owners and developers must build the units to HUD specifications and accept tenants based upon HUD guidelines. In addition, the developer's revenues are limited by various HUD regulations. 24 C.F.R. § 880.205 (1988).
Testimony regarding the operation of Rebelwood showed an annual gross income of approximately $670,000.00. Of this figure, $110,000.00 represented rents actually paid by the tenants while $560,000.00 was received in the form of a federal rental subsidy. As with most subsidized housing, Rebelwood is an attractive place to live for those with marginal incomes and has a waiting list for prospective tenants. The average occupancy rate for Rebelwood is 98%. As such, the operating statement for 1983 may be considered representative of the income-generating capacity for Rebelwood for the life of the federally-subsidized mortgage  40 years. Since the subsidy benefits conferred by the participation in the federal program are transferable, any *1360 future purchasers of the Rebelwood complex would also acquire them.

C.
At trial, appraisers for each party studied Rebelwood under the three statutorily-authorized approaches to value: the cost approach, the income capitalization approach and the market data or comparative sales approach. Miss. Code Ann. § 27-35-50(2) (Supp. 1988). These approaches do not, considered singly, establish value. Each rather is one approach to value, with the appraiser's estimate of value being, in the end, an opinion which is the product of a reconciliation of the indications yielded by the three approaches.[4] That opinion is and must be of the value of the property, not its owners or management, for it is the property that is being valued, assessed and taxed.
We will consider separately each approach to value and the evidence adduced at trial.

Cost Approach
The cost approach[5] is a method by which the value of the property is derived by estimating the replacement cost of the improvements and deducting from that figure the estimated physical depreciation and any form of obsolescence, if appropriate. This figure is then added to the market value of the land to yield an overall valuation of the realty.
Taxpayer's appraisers suggest that the cost approach indicates a value of the Rebelwood complex at $2,042,000.00. Hinds County's appraisers offered an opinion that the cost approach indicates a value of $4,044,900.00.
The disparity between these two figures can be attributed primarily to the inclusion by Taxpayer's appraisers of some $1,535,000.00 in "functional economic obsolescence." The appraisers reasoned that, because Rebelwood was built pursuant to HUD specifications, including various non-competitive floor plans (e.g., five-bedroom apartments), and the amenities provided are minimal (e.g., no air-conditioning), the complex would not be an attractive investment if placed on the open market.
The appraisers for the County testified that functional depreciation has no application to the use to which the property was put for the tax years in question, 1984 and 1985, a use, we might add, which will presumably continue for the next 35 years. Further, as one of the County's appraisers testified: "This property was operating at better than 95% occupancy  97% occupancy  and there was no way to measure functional or economic depreciation when you have that situation." The thrust of the testimony of the County's appraisers was that the functional obsolescence of the complex was hypothetical (at best) because Rebelwood exists as a subsidized housing complex, not as one operating in a free market environment.

Market Data or Comparative Sales Approach
Market data or comparative sales *1361 approach[6] is, as its alternative names imply, an approach to value in which the value estimate is predicated upon prices actually paid in open market transactions for various properties similar to the one at issue in the appraisal. The price paid for a similar apartment complex would then be evaluated with reference to the yearly gross income that such a property could expect to earn. The multiplier resulting from such an evaluation is used to account for variations existing between the properties recently sold regarding size (number of units), age and location.
The appraiser for Hinds County analyzed the recent sales of similar subsidized housing, compared them against their respective gross incomes and arrived at a multiplier in the range of 5.5 to 7.0. The appraiser chose to employ a multiplier in the lower end of this range  6.0. The gross income, as reflected in the operating statement for Rebelwood, was then multiplied by 6.0 and yielded a value indication of $4,039,998.00.
Taxpayer's appraisers also employed the market data approach, but began their analysis with a somewhat different assumption. The comparative sales analyzed by Taxpayer's appraisers included no subsidized housing. The appraisers also disregarded the rental subsidy income received by Rebelwood as well as the cash-flow advantages of Rebelwood's 7 1/2% mortgage. The rationale behind this exclusion was explained by Taxpayer's appraiser:
The sale of a HUD ... for a practical matter, if any had sold they would have almost surely sold with the low interest rate mortgage going, with all the subsidies going and the real estate. Now if I were appraising a HUD for sale of all three together, yes, but I'm not. I'm appraising it for the real estate only. Had I had a sale of a HUD property, I can think of no practical ways to separate the three items so that I could back it into the real estate only. And since I am appraising for real estate only, I found sales that were of real estate only, not sales that included things other than the real estate. And that's why I didn't use any HUD sales.
By using the recent sales of non-subsidized housing as a comparison and by excluding the advantages the complex possessed by virtue of its rent and mortgage subsidies, Taxpayer's appraisers testified that the market data approach suggests a value of $1,892,000.00.

Income Capitalization Approach
In the income capitalization approach[7] the anticipated net income which *1362 the property is expected to generate over its usable life is capitalized and processed to indicate the capital investment which produces the net income. In this approach, more than either of the others, it is important to keep well in mind that it is the property that is being valued and assessed and not management.
The Hinds County appraisers offered their opinion that the income approach indicates a value for Rebelwood at $3,978,780.00. The starting point for these appraisers was that the estimated net income as deduced from Rebelwood's operating statement for 1982  $437,665  was a representative figure and this amount of income would continue in the future.
Taxpayer's appraisers began their income analysis with the assumption that Rebelwood was not a subsidized complex, eschewing the income figures from the operating statement in favor of a hypothetical income which Rebelwood could be expected to earn on the open market. In addition, Taxpayer's appraisers hypothesized that the vacancy rate would be greater  in the neighborhood of 5%. One appraiser explained the rationale for this adjustment:
Right now it's very simple to keep it fully rented because the tenants are not paying their own rent. They are offered virtually free rent. It's very easy under those conditions to find people who want to move into these apartments. They keep a waiting list, a serious waiting list of people who are ready to move in just like that... . Now in the free world, when somebody moves out, what you've got to do is run ads in the paper, get people in, show it to them, persuade them to part with $280.00 a month to live there, and you run into a much higher vacancy that way than you do under one where somebody else is paying the man's rent.
Using this postulated gross income figure, Taxpayer's appraisers found that the income capitalization approach indicates a value of $1,860,000.00.

D.
After a two-day trial where the parties' experts offered widely conflicting evidence regarding the value of the property, the jury returned a finding that the "true value" of the property was $3,180,000.00. The Circuit Court on October 7, 1986, entered judgment in accordance with the verdict.
Taxpayer now appeals to this Court and files nine assignments of error. In its brief, Taxpayer treats these assignments as directed to two essential issues:
(1) The Circuit Court erred in instructing the jury to consider the value of any federal subsidy received by the taxpayer in determining a "true value" for the housing complex.
(2) A valuation which considers the amount of federal subsidy received by the taxpayer violates the Uniformity and Equalization in Value Clause of the Mississippi Constitution and the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.
Hinds County has cross-appealed, claiming that the determination of value rendered by the jury was not based upon any competent evidence in the record. We affirm on direct appeal and reverse and render on Hinds County's cross-appeal.

III.
Inclusion or exclusion of the value of federal subsidies, inuring to the Taxpayer as owner of Rebelwood, dictates vastly disparate estimates as to Rebelwood's "true value". Consideration of these subsidies in the assessment of value is the sine qua non of the appeal.
*1363 Our point of beginning is the recognition that value in today's setting is a function of positive, and not natural law. See General Motors Corp. v. State Tax Commission, 510 So.2d 498, 500 (Miss. 1987); Mississippi State Tax Commission v. Dyer Investment Co., Inc., 507 So.2d 1287, 1290 (Miss. 1987). Natural or economic indicia of value are of consequence only insofar as they have been recognized in our positive law. Happily, we find much in our law that is consonant with sound economic and appraisal theory.
Our state's law on the point finds its source in Miss. Const. Art. 4, § 112 (1890, as amended) which provides, inter alia, that property of the sort before us today "shall be ... [assessed] according to current use, regardless of location." The constitutional mandate has been implemented in Miss. Code Ann. § 27-35-50 (Supp. 1988), which twice reiterates the current use concept.[8] Rebelwood in 1984 and 1985 was used as a federally subsidized low-income housing project.
Of greater importance is a second provision found in the legislative directive, as reflected in the above-mentioned statute. Our public assessors are directed to consider certain specific factors affecting value of subject property and are then told to consider "any other circumstances that tend to affect its value." Federal subsidies received by Taxpayer on account of Rebelwood  both those designated for rental payments as well as those for debt retirement  qualify as "any other circumstances that tend to affect" the value of this property. This language codified the view accepted by this Court in McCardle's Estate v. City of Jackson, 215 Miss. 571, 579, 61 So.2d 400, 402 (1952), where the Court announced that "[a]ll of the facts as to the condition of the property, its surroundings, its improvements, and capabilities may be considered." 215 Miss. at 579, 61 So.2d at 402.
This case concerns the assignment of value for specific years: 1984 and 1985. One relevance of the "use" inquiry is to determine the assessment ratio for each year and to fix our focus upon the actual and not the hypothetical. All single-family, owner-occupied, residential real property, labeled Class I property, must be assessed at ten percent (10%) of true value. Miss. Const. Art. 4, § 112 (1890, as amended); Miss. Code Ann. § 27-35-4(1) (Supp. 1988). Class II includes all other real property, except that owned by public utilities. State law provides that Class II real property shall be assessed at fifteen percent (15%) of true value. Miss. Const. Art. 4, § 112 (1890, as amended); Miss. Code Ann. § 27-35-4(2) (Supp. 1988). Rebelwood is Class II real property.
Beyond this, the function of the current use requirement is quite limited. It makes *1364 clear that the concept of highest and best use, familiar in such contexts as eminent domain and fair market appraisals of value generally, has no place in this state's ad valorem taxation system.[9] The most familiar illustration is farm land lying in the immediate path of growth of a municipality. The highest and best and most valuable use of such land will often be development of a residential subdivision. Our law allows the owner to continue to farm the land, if he wishes, and tells him the land will be taxed as farmland so long as he continues to use it as such, even though as farmland it has a lower true value than it would be assigned if it were treated as residential property. By the same token, if, hypothetically, the area surrounding Rebelwood were used for high rise commercial office buildings  so that Rebelwood's fair market value were greatly increased over its value as an apartment complex  our law would mandate that it continue to be assessed as an apartment complex  until such time as Taxpayer saw fit to convert it to the higher use by demolition and new construction or by sale.
Seen in this light, the sound and fury over Rebelwood's current use label is seen signifying nothing. It matters not whether we employ as a use label "open market apartment complex," "federally subsidized low income housing," "multi-family dwellings" or whatever. The battle is over value. Our question is whether the federal benefits enjoyed by Rebelwood affect its value  to Taxpayer or in the open market. Because those benefits make ownership of the property by Taxpayer more desirable than without, they must sensibly be considered in assessing value in use. And because those benefits may be transferred to purchasers, the same obtains for Rebelwood's value in exchange.
The point is made clear by thought of the factors affecting value.
Value is extrinsic to the commodity, good or service to which it is ascribed; it is created in the minds of individuals who constitute a market. The relationships that create value are complex, and values change with changes in the factors that are most influential. Typically, four interdependent economic factors create value: utility, scarcity, desire, and effective purchasing power. All four factors must be present for a property to have value.[10]
Rebelwood's utility to Taxpayer in the years in question was greatly enhanced by the package of federal benefits Taxpayer enjoyed. In this sense, Rebelwood's value was enhanced.
Effective purchasing power is equally important. This factor affecting value refers to

the ability of an individual or group to participate in a market  that is, to acquire goods and services with cash or its equivalent. A valid estimate of the value of a property includes an accurate judgment of the market's ability to pay for the property.[11]
Our law's insistence that property be valued according to current use does not change this. Think of the value of a residence if there were no financing available, public or private. What an individual could sell his or her house for would be drastically reduced. The willing buyer/willing seller test of value necessarily incorporates the idea that willingness is a function of effective purchasing power, i.e., it is idle to suggest that I am willing to pay $100,000 for your house if I have no way of obtaining access to more than $10,000 with which to pay you. The experience of the past century surely makes clear that changes in the availability of financing radically affects the values of properties.
In the context of a federally subsidized low income housing project, these considerations *1365 also obtain. No one would build a Rebelwood if it were not for the federal benefits and subsidies. The availability of the federal programs makes it economically feasible and desirable to engage in such an enterprise. Indeed, that is precisely the reason the Congress authorized such a program, to provide incentives to people to invest in low income housing projects and thus increase the availability of such housing. But if you take away the federal programs, Rebelwood goes broke tomorrow. Its value is far less without the federal programs. And, if in future tax years the federal programs be stripped away, Rebelwood's assessment will be reduced as its value is reduced.
Still, Taxpayer advances the argument that this state should frame its public policy so as to encourage federally subsidized low-income housing investment and that taxation of these benefits received in the form of subsidies would somehow discourage this sort of investment. Of course, Congress has already provided quite adequate incentives to such housing. The point is seen ephemeral, as the federal regulations controlling the owners' return on investment take into account local property tax increases.[12]
We have canvassed the reported decisions in other states and find that the majority by far subscribe generally to the view we accept. See, e.g., Executive Square, Ltd. v. Board of Tax Review, 11 Conn. App. 566, 528 A.2d 409, 413 (1987); In re Johnstown Assoc., 494 Pa. 433, 431 A.2d 932 (1981); Kankakee County Board of Review v. Property Tax Appeal Board, 163 Ill. App.3d 811, 114 Ill.Dec. 851, 855, 516 N.E.2d 1006, 1010 (1987); Steele v. Town of Allenstown, 124 N.H. 487, 471 A.2d 1179, 1182 (1984); Antisdale v. The City of Galesburg, 420 Mich. 265, 362 N.W.2d 632, 639 (1985). Only Ohio appears to take the view urged by Rebelwood. See Canton Towers v. Board of Revision of Stark County, 3 Ohio St.3d 4, 444 N.E.2d 1027 (1983); Alliance Towers v. Stark County Board of Revision, 37 Ohio St.3d 16, 523 N.E.2d 826, 832-33 (1988). We have reviewed the Ohio decisions and find them unpersuasive.
We hold that the value of any federal subsidy or benefits enjoyed by Taxpayer by reason of its ownership of Rebelwood must be considered in establishing true value for each year in which such subsidy or benefits are in fact enjoyed. The assignment of error is denied.

IV.
We turn now to Taxpayer's charge of discrimination: that incorporation into Rebelwood's true value of the value of federal subsidies offends Taxpayer's rights under the amended Uniformity and Equality Clause of this state's constitution. See Miss. Const. Art. 4, § 112 (Supp. 1984)[13] Also implicated is the Equal Protection Clause of the federal constitution.
The goal of these constitutional mandates is a fair and equitable distribution of the tax burden. Our history tells of two ways that goal may be thwarted. First, we have seen widely varying assessment ratios  the ratio of assessed value to true value  though the properties may have been of like kind, quality and value. This form of discrimination has been largely eradicated, although to an extent legalized, by the 1986 amendments to Section 112 of the Mississippi Constitution. No charge is *1366 made here of that form of assessment discrimination. Rebelwood like all other Class II property is assessed at fifteen percent of true value.
The second form of assessment discrimination has been at once more subtle and blatant  and more difficult to detect and correct. We refer to discrimination in the assignment of true value  before the assessment ratio is ever applied. Where properties, superficially similar but in fact having widely varying true values, are assigned the same true value, this form of discrimination occurs. A familiar example is the assessment of all cultivatable agricultural acreage at the same dollars per acre value.[14] Conversely, such discrimination occurs when properties of like kind, quality and value are assigned widely varying true values.
Taxpayer charges this latter form of discrimination. To support its argument, Taxpayer posits the following illustration:
Two properties (property A and property B) sat side by side. Both properties were multi-family complexes. Both properties were in virtually the same location.... The only difference between property A and property B was the fact that property A was a conventional, non-subsidized housing project constructed by means of conventional market financing and operating without housing assistance payments from the federal government. Property B, on the other hand, was developed with below-market financing under HUD's § 221(d)(4) [12 U.S.C. § 1715] program and received housing assistance payments under HUD's Section 8 program... .
Under the scenario described above, Mr. Barnes [the County's appraiser] testified that his office would tax property A at a lower assessed value than property B. This tax inequality would exist despite the fact that the properties were identical in every respect except for the existence of government subsidies.
Section 112 of the Mississippi Constitution requires uniformity and equality in taxation. City of Jackson v. Pittman, 484 So.2d 998, 999 (Miss. 1986); Washington County Board of Supervisors v. Greenville Mill, 437 So.2d 401, 403-04 (Miss. 1983); see also Calhoun County Board of Supervisors v. Grenada Bank, 543 So.2d 138, 140 (Miss. 1988); State Tax Commission v. Fondren, 387 So.2d 712, 715-20 (Miss. 1980); Fondren v. State Tax Commission, 350 So.2d 1329, 1334 (Miss. 1977). This requirement is satisfied when, in establishing true value, the public assessor considers all factors affecting the value of the property, and employs the same assessment ratio. The federal subsidies enjoyed by Rebelwood affect its value to Taxpayer, and because transferrable, to a prospective purchaser as well. Absent a showing that other federally subsidized housing projects are treated differently, or that, in the case of free market apartment complexes, the Hinds County assessor does not consider all factors affecting value, Section 112 affords Taxpayer no right to relief. See Lavecchia v. Vicksburg, 197 Miss. 860, 20 So.2d 831 (1945), holding that the assessed valuation of a taxpayer's property be equal and uniform with that of other like property in the city. See also Peterson v. Sandoz, 451 So.2d 216, 219 (Miss. 1984):
[T]axes should be uniformly and equally collected from a class of similarly situated taxpayers if it is to provide those within the class to equal and constitutional treatment under the law. [emphasis added]
The Supreme Court of the United States has for at least seventy years enforced in this context rights secured by the Equal Protection Clause. A taxpayer is entitled to relief if he proves that his property has been assigned an assessed value substantially higher than similar properties. Allegheny Pittsburgh Coal Company v. County Commission of Webster County, W. Va., 488 U.S. ___, 109 S.Ct. 633, 102 L.Ed.2d 688 (1989). Township *1367 of Hillsborough v. Cromwell, 326 U.S. 620, 66 S.Ct. 445, 90 L.Ed. 358 (1946); Cumberland Coal Co. v. Board of Revision of Tax Assessments, 284 U.S. 23, 52 S.Ct. 48, 76 L.Ed. 146 (1931); Sioux City Bridge Co. v. Dakota County, Nebraska, 260 U.S. 441, 43 S.Ct. 190, 67 L.Ed. 340 (1923); and Sunday Lake Iron Co. v. Township of Wakefield, 247 U.S. 350, 38 S.Ct. 495, 62 L.Ed. 1154 (1918). This Court as well has recognized historically the function of the Equal Protection Clause in assessment equalization jurisprudence. City of Jackson v. Pittman, 484 So.2d 998, 999 (Miss. 1986); Board of Supervisors v. Standard Oil Co., 353 So.2d 1137, 1138 (Miss. 1977); American National Insurance Co. v. Board of Supervisors, 303 So.2d 457, 459 (Miss. 1974); Knox v. Southern Paper Co., 143 Miss. 870, 879, 108 So. 288, 290 (1926). But where, as here, Taxpayer's property has been valued and assessed according to the value the same as other like properties, the Equal Protection Clause affords no relief.
Taxpayer relies on Stuart v. Board of Supervisors, 195 Miss. 1, 11 So.2d 212 (1943), as standing for the proposition that the County's standard for determining functional and economic depreciation discriminates against subsidized housing and, therefore, the County's appraisal of Rebelwood violates Section 112 and the Equal Protection Clause. In actuality, Stuart supports Hinds County's argument. Section 112 requires, as Stuart states, that no parcel of real property shall be assessed at more than actual value. As demonstrated, Rebelwood's actual value is the value that it has on the open market, the value that a willing buyer and willing seller would put on the property, assuming its current use as subsidized housing. If no actual functional obsolescence exists, Section 112 does not require that deductions be allowed. The result desired by Taxpayer, that Rebelwood be treated differently from other commercial housing and its income ignored in place of a fictional income, would itself be violative of Section 112's requirement of uniformity, and, as well, of the Equal Protection Clause.
As with Taxpayer's first assignment, there are no Mississippi cases directly on point. Indeed, we find but one case where the owner of a federally subsidized complex challenged the assessment based upon a constitutionally-mandated equalization scheme. In In re Johnstown Assoc., 494 Pa. 433, 431 A.2d 932 (1981), the Supreme Court of Pennsylvania responded to this argument as follows:
The Pennsylvania Constitution, art. VIII, § 1, states that "all taxes shall be uniform on the same class of subjects ..." Indeed, this Court has held that the constitutional requirement of uniformity is satisfied so long as the taxing authority assesses all property at the same percentage of its actual value; by maintaining such a uniform ratio, each property will be held accountable for its pro rata share of the burden of local government... . The uniformity standard is not violated by allowing variations, between buildings, with respect to ratios of taxes to income.

In re Johnstown Assoc., 431 A.2d at 934 (emphasis added).
As in Pennsylvania, property valuation in this state may consider the gross income generated by the property as an indicator of value. McArdle's Estate v. City of Jackson, 215 Miss. 571, 579, 61 So.2d 400, 402 (1952). It is not, therefore, a constitutional violation to value differently otherwise identical properties if the disparate values result from disparate revenue-generating capabilities. The constitutional issue raised in Taxpayer's appeal is without merit.

V.
Hinds County presents a cross-appeal. The County argues that the Circuit Court erred when it refused to hold, as a matter of law, that for the years in question, the true value of Rebelwood Complex was $4,044,950.00. Procedurally, Hinds County argues that the Circuit Court erred when it refused to direct a verdict in the County's favor on the issue of value, and, thereafter, when it refused to correct this error via *1368 post-trial motion for judgment notwithstanding the verdict.
Hinds County bases this claim on its view that Taxpayer's valuation witnesses ignored the legal mandate that all factors affecting value be considered. More fully, Hinds County's point is that, without contradiction, the federal subsidy and benefits enjoyed by Rebelwood have a substantial value and that Taxpayer's "experts admit that they made no attempt to appraise the property according to current use, choosing instead to create a hypothetical situation and appraise Rebelwood as if it were a free-market type apartment complex."
Put otherwise, Hinds County's point is that there is no credible evidence in the record from which the jury may have concluded that the true value of Rebelwood was $3,180,000.00. Either the legal definition of true value required inclusion of the value of federal subsidy and benefits, in which event true value would be the County's figure of approximately $4,000,000.00, or any such subsidy and benefits were properly excludable and Rebelwood would be treated as "a free-market type apartment complex," in which event true value of Rebelwood would necessarily be Taxpayer's figure of slightly less than $2,000,000.00. Our review of the record convinces us that there truly is no middle ground and that everything turns on the correct interpretation of the definition of true value found in Section 27-35-50. We have considered and resolved the point in Part III above.
Because we are concerned with an attack on a jury verdict, our scope of review is as limited as it is familiar. We have recently reiterated that scope of review in Guerdon Industries, Inc. v. Gentry, 531 So.2d 1202 (Miss. 1988) as follows:
... [W]hen a trial court, or the Supreme Court . .. [on appeal], considers such a motion [for directed verdict or judgment notwithstanding the verdict] it must do so `in the light most favorable to the party opposed to the motion.' [citations omitted] The non-movant must also be given the benefit of all favorable inferences that may reasonably be drawn from the evidence. If the facts and inferences so considered point so overwhelming in favor of the defendant [movant] that reasonable men and women could not have arrived at a verdict for the plaintiff [non-movant], granting the motion is required. The burden upon the movant in such cases is great, for if there is "substantial" evidence opposed to the motion, which would allow reasonable and fair-minded men and women to reach differing conclusions, the motion must be denied. [citations omitted]
531 So.2d at 1205; Stubblefield v. Jesco, Inc., 464 So.2d 47, 54 (Miss. 1984); Paymaster Oil Mill Co. v. Mitchell, 319 So.2d 652, 657 (Miss. 1975). This rule is necessary so that Taxpayer's right to trial by jury be respected the same as in any other civil case. City of Jackson v. Locklar, 431 So.2d 475, 478 (Miss. 1983). This view obtains in property tax appeals heard de novo in the circuit court the same as in any other civil case tried before a jury. Board of Supervisors of Jackson County v. Standard Oil Company, 353 So.2d 1137, 1138 (Miss. 1977); see also Calhoun County Board of Supervisors v. Grenada Bank, 543 So.2d 138, 140 (Miss. 1988) (petition for rehearing pending).
In the ordinary case where each litigant presents an all or nothing point of view and where the jury returns a verdict "somewhere in between," we will be slow to intervene. Where, for example, in an automobile collision case a plaintiff contends that the defendant was the sole party at fault and where the defendant in return argues that the accident was entirely caused by the plaintiff's negligence, often the evidence will quite comfortably permit a conclusion that each party was partially to blame. Here, however, we perceive no basis for a compromise. Everything turns on the definition of true value. As explained above, we resolve that issue in favor of Hinds County and hold on this record, as a matter of law, that the value of any federal subsidy or benefits enjoyed by Taxpayer by reason of its ownership of Rebelwood must be included in establishing its true value for each year in which such *1369 subsidy or benefits are in fact enjoyed. This being the case, there is no way on this record that our hypothetical, rational juror who gave all good fidelity to the rule of law could have reached any conclusion other than that the true value of the property for the years in question was approximately $4,000,000.00.
In settling upon the precise true value to be assigned this property for 1984 and 1985, we must give close attention to the lowest figure, i.e., the true value estimate most favorable to Taxpayer, that the jury could rationally have returned. Hinds County appears to argue that its assessment of $4,000,000.00 is entitled to a presumption of correctness and, because Taxpayer's appraisers ignored current use, the original assessment should stand. However viable such a presumption may be at earlier stages of the process,[15] it evaporates in light of the extensive proof offered by both sides before the Circuit Court and its jury.
We reiterate that the values suggested by an appraiser following one of the approaches to value is not in and of itself an appraisal. A professionally and legally acceptable assessment of value is an opinion which is the product of a reconciliation of  and not an averaging of  the values indicated by each of the three approaches to value. Rare is the day when a competent appraisal may be based on a single approach. We consider in this light the indications of value as found by those appraisals which correctly assigned current use. These are:

Cost Approach $4,044,900.00
Market Data Approach $4,039,998.00
Income Capitalization Approach $3,978,780.00

Having well in mind our limited scope of review and that we must give Taxpayer every benefit of the doubt where the evidence is disputed  so long as we apply the correct legal standard regarding current use, we hold that no hypothetical, rational juror could have concluded on this record that for the years 1984 and 1985 Rebelwood had a true value of less than $3,978,780.00. Emphasis upon the income capitalization approach to value is particularly appropriate here in that the primary reason why Taxpayer holds such property is for the production of income. Moreover, the quality of data available makes credible the income capitalization approach to value.
By reason of the foregoing, we regard Hinds County's cross-appeal as well taken. We vacate the judgment of the Circuit Court insofar as it adjudges the true value of the Rebelwood Complex and we now hold as a matter of law that for the years 1984 and 1985 the true value of Rebelwood was $3,978,780.00.
One feature of the property assessment valuation process should ease Taxpayer's pain a bit. The assessment of value is not permanent. We are today concerned only with the true value of Rebelwood for the years 1984 and 1985, years in which no one disputes that the complex was used as a federally subsidized low income housing complex and enjoyed valuable federal benefits. If for any reason in the future the federal government pulls the rug out from under Rebelwood, that no doubt would affect its value. Because Taxpayer, like any other property owner, is entitled to have its property valued and assessed each year, any such change will surely be reflected in the succeeding year's valuations and assessments. If we should reach a point in time in the future when Rebelwood's functional obsolescence really does affect true value, the law no doubt would afford Taxpayer the right to a substantially reduced assessed value. So long, however, as Rebelwood enjoys the benefits of the federal subsidies and a 98 percent occupancy rate, however, Taxpayer's approach to value will remain quite hypothetical at best, and when we consider that federal regulations allow Taxpayer adjusted benefits for Rebelwood to reflect changing property tax obligations, Taxpayer's argument before this Court appears a bit disingenuous.
*1370 AFFIRMED ON DIRECT APPEAL; REVERSED AND RENDERED ON CROSS-APPEAL.
ROY NOBLE LEE, C.J., HAWKINS, P.J., and ANDERSON, J., concur.
DAN M. LEE, P.J., concurs to Parts I, II, III and IV and dissents to Part V.
PITTMAN, J., HAWKINS, P.J., and SULLIVAN, J., specially concur by separate written opinion.
BLASS and PRATHER, JJ., not participating.
PITTMAN, Justice, specially concurring:
The majority opinion rightfully would include a rental income as part of the total assessment. Though our inclusion of federal subsidies as a part of property valuation for tax purposes breaks new ground in the area of taxation, the rental income inclusion is not inconsistent with prior methods of assessment or holdings of this Court. McArdle's Estate v. City of Jackson, 215 Miss. 571, 579, 61 So.2d 400, 402 (1952).
However, the tenor of the majority opinion would include all federal subsidies for tax valuation and from its dicta could have each tax assessor looking at mortgage interest rates to tax the more favorable mortgages by inclusion in tax valuation and looking behind various and changing farm subsidies to include them specifically in tax valuation. The federal subsidies for Rebelwood are easily isolated and are included and taxed. Not so for many other federally sponsored subsidies; therefore, this opinion should be limited to income or rental value only and not so sweeping as to include interest subsidies or possibly farm subsidies or other creative financing programs sponsored by the federal government. The majority opinion reaches the right result, but this is new ground and could produce new types of taxation. Tradewinds East Associates v. Hampton Charter Township, 159 Mich. App. 77, 406 N.W.2d 845 (1987).
HAWKINS, P.J., and SULLIVAN, J., join this opinion.
NOTES
[1] See Rule 28(d), Miss.Sup.Ct.Rules.
[2] Class II includes all real property other than single-family, owner-occupied, residential property and public utility property owned or used by public service corporations. Miss. Const. Art. 4, § 112 (1890, as amended).
[3] Hinds County took the lead in resisting Taxpayer's appeal before the Circuit Court and before this Court. By agreed orders entered by the Circuit Court on July 7, 1986, the true value of Rebelwood finally established in this litigation will be accepted by Taxpayer and the City of Jackson as true value for city ad valorem tax purposes for the years 1984 and 1985.
[4] See American Institute of Real Estate Appraisers, The Appraisal of Real Estate 72, 561-68 (9th ed. 1987); International Association of Assessing Officers, Property Assessment Valuation 42-43 (1977); W. Kinnard, Income Property Valuation 441-46 (1971).
[5] The cost approach involves a determination of the "current" cost of reproducing property less loss in value from deterioration and functional and economic obsolescence  accrual depreciation. There are five basic steps involved in this approach:

1. The estimate of the land value as if vacant
2. The estimate of the current cost of reproducing or replacing the existing improvements
3. The estimate of accrued depreciation from all causes
4. Deduction of accrued depreciation estimate to arrive at indicated value of improvements
5. The addition of the land value to the indicated value of the improvements to develop indicated property value.
The Appraisal of Real Estate, supra, at 71, 345-404; Property Assessment Valuation, supra, at 131-83. See also W. Kinnard, supra, at 347-77; R. Suter, The Appraisal of Farm Real Estate 329-50 (1974).
[6] The market data approach involves an analysis of actual arm's length sales of property similar to the subject property. An application of this approach involves five basic steps:

1. [Seek] out similar properties for which pertinent sales, listings, offerings, and/or rental data are available.
2. [Ascertain] the nature of the conditions of sale, including the price, terms, motivating forces, and its bona fide nature.
3. [Analyze] each of the comparable properties' important attributes with the corresponding ones of the property being appraised, under the general divisions of time, location and other characteristics, including physical and economic.
4. [Consider] the dissimilarities in the characteristics disclosed in Step 3, in terms of their probable effect on the sale price.
5. [Formulate] in the light of the comparisons thus made, an opinion of the relative value of the subject property as a whole, or, where appropriate, by applicable units, compared with each of the similar properties.
The Appraisal of Real Estate, supra, at 70-71, 311-42; Property Assessment Valuation, supra, at 105-30; W. Kinnard, supra, at 329-43; R. Suter, supra, at 293-326.
[7] The income or earnings approach determines value by reference to the property's income-producing capacity under typical management. See Crocker v. Mississippi State Highway Commission, 534 So.2d 549, 553 (Miss. 1988); Georgia Pacific Corp. v. Armstrong, 451 So.2d 201, 207 (Miss. 1984). In a commercial rental context, the four steps basically followed are:

1. Obtain the rent schedules and the percentage of occupancy for the subject property and for comparable properties for the current year and for several past years. This information provides gross rental data and the trend in rentals and occupancy. This data is then compared and adjusted to an effective estimate of gross income which the subject property may reasonably be expected to produce.
2. Obtain expense data, such as taxes, insurance and operating costs being paid by the subject property and by comparable properties. The trend in these expenses is also significant.
3. Estimate the remaining economic life of the building to establish the probable duration of its income, or, alternately, estimate the suitable period of ownership before resale.
4. Select the appropriate capitalization method and the applicable technique and appropriate rate for processing the net income.
The Appraisal of Real Estate, supra, at 71-72, 407-558; Property Assessment Valuation, supra, at 203-75; W. Kinnard, supra, at 383-436; R. Suter, supra at 293-326.
[8] In relevant part, Miss. Code Ann. § 27-35-50 (Supp. 1988) reads:

(1) True value shall mean and include, but shall not be limited to, market value, cash value, actual cash value, proper value and value for the purposes of appraisal for ad valorem taxation.
(2) With respect to each and every parcel of property subject to assessment, the tax assessor shall, in ascertaining true value, consider whenever possible the income capitalization approach to value, the cost approach to value, and the market data approach to value, as such approaches are determined by the State Tax Commission... . The choice of the particular valuation approach or approaches to be used should be made by the assessor upon a consideration of the category or nature of the property, the approaches to value for which the highest quality data is available and, the current use of the property.
(3) Except as otherwise provided in subsection (4) of this section, in determining the true value of land and improvements thereon, factors to be taken into consideration are the proximity to navigation, to a highway, to a railroad, to a city, town, village, or road, and any other circumstances that tend to affect its value, and not what it might bring at a forced sale, but what the owner would be willing to accept and would expect to receive for it if he were disposed to sell it to another able and willing to buy.
(4) In arriving at the true value of all Class I and Class II property and improvements, the appraisal shall be made according to current use, regardless of location.
* * * * * *
In determining the true value based upon current use, no consideration shall be taken of the prospective value such property might have if it were put to some other possible use. [Emphasis added]
Rebelwood is Class II real property. Miss. Const. Art. 4, § 112 (1890, as amended); Miss. Code Ann. § 27-35-4(2) (Supp. 1988).
[9] For a brief summary of use value as compared with fair market value, see The Appraisal of Real Estate, supra, at 16-21; and Robertson, Problems of Valuation and Equalization in Mississippi's Ad Valorem Tax System, 48 Miss.L.J. 201, 217 (1977); see generally Posner, Economic Analysis of Law 459 (3d ed. 1986).
[10] The Appraisal of Real Estate, supra, at 22. [Emphasis supplied].
[11] The Appraisal of Real Estate, supra, at 23. [Emphasis in original]
[12] The applicable HUD regulation reads:

(a) Automatic annual adjustment of contract rents. Upon request from the owner to the contract administrator, contract rents will be adjusted on the anniversary date of the contract... .
(b) Special additional adjustments. For all projects, special additional adjustments will be granted, to the extent determined necessary by HUD, to reflect increases in the actual and necessary expenses of owning and maintaining the assisted units which have resulted from substantial general increases in real property taxes, assessments, utility rates, and utilities not covered by regulated rates, and which are not adequately compensated for by annual adjustments under paragraph (a) of this section.
24 C.F.R. § 880.609 (1988) (emphasis added).
[13] The amendment of this section, effective after the tax years at issue, did not alter the equalization directive for any purpose relevant to Taxpayer's appeal. 1986 Miss. Laws ch. 522 (effective June, 1986).
[14] See Robertson, Problems of Valuation and Equalization in Mississippi's Ad Valorem Tax System, 48 Miss.L.J. 201, 230-32 (1977).
[15] Compare Marx v. Bounds, 528 So.2d 822, 825 (Miss. 1988) and W.H. Hopper & Associates, Inc. v. DeSoto County, 475 So.2d 1149, 1152 (Miss. 1985) regarding the presumption of correctness and burden of proof in state and county tax litigation.