(Nos. 66396, 66397 cons.—

THE KANKAKEE COUNTY BOARD OF REVIEW, Appellee, v. THE PROPERTY TAX APPEAL BOARD *et al.*, Appellants.

*Opinion filed September 20, 1989.*

2

4

CALVO, J., took no part.

Neil F. Hartigan, Attorney General, of Springfield (Shawn W. Denney and Robert J. Ruiz, Solicitors General, and Bret A. Rappaport, Assistant Attorney General, of Chicago, of counsel), for appellant Property Tax Appeal Board.

Ronald E. Shadle, of Cappetta & Shadle, of Oak Brook Terrace, and John L. O'Brien, of Herschbach, Tracy, Johnson, Bertani & Wilson, of Joliet, for appellants Riverwoods Associates and American National Bank & Trust Co.

William Herzog, State's Attorney, of Kankakee, and Kenneth R. Boyle and John X. Breslin, of the State's Attorneys Appellate Prosecutor, of Ottawa, for appellee.

Fred L. Foreman, State's Attorney, of Waukegan (Ernest Y. Ling, Joseph E. Kolar and James C. Bakk,

Assistant State's Attorneys, of counsel), for *amicus curiae* Lake County Board of Review.

JUSTICE WARD delivered the opinion of the court:

This appeal arises from an administrative review proceeding. Riverwoods Associates (Riverwoods) filed a complaint with the Kankakee County board of review (Review Board) alleging that the assessor of Kankakee County had overassessed its property in 1984. The Review Board determined that the property had a fair market value of $7,904,735 and under section 20 of the Revenue Act of 1939 (Ill. Rev. Stat. 1983, ch. 120, par. 501) should be assessed at one-third of that value, or $2,632,722. The Review Board refused to reduce the assessment, and Riverwoods appealed to the Illinois Property Tax Appeal Board (PTAB). The PTAB conducted a hearing pursuant to its statutory authority (Ill. Rev. Stat. 1987, ch. 120, par. 592.3) and reduced the valuation of the property from $7,904,735 to $2,325,000, finding that the rent subsidy Riverwoods received pursuant to a contract with the Illinois Housing Development Authority should not be considered in determining the value of the property for tax purposes. The PTAB accordingly reduced the tax assessment on the property from $2,632,722 to $775,388. The Review Board filed a petition in the circuit court of Kankakee County for administrative review of the PTAB's decision (Ill. Rev. Stat. 1987, ch. 110, par. 3—104) and the circuit court affirmed the PTAB's decision. The Review Board appealed and the appellate court reversed, holding that the PTAB erred as a matter of law in adopting a valuation approach which ignored the subsidy Riverwoods received from the Illinois Housing Development Authority. (163 Ill. App. 3d 811.) We granted the PTAB's petition for leave to appeal in No. 66396 and Riverwoods' petition for leave to appeal in No. 66397. 107 Ill. 2d R. 315(a).

Riverwoods Apartments is a 125-unit building located in the city of Kankakee. The building is rented exclusively to elderly residents, whose rent is subsidized under an agreement with the Illinois Housing Development Authority. The terms of the subsidy agreement are not part of the record. The property owner, Riverwoods Associates, appeared before the Kankakee County board of review (the Review Board) complaining that the assessor had improperly assessed the value of the property and requesting a tax reduction. The Review Board denied its complaint and Riverwoods appealed to the PTAB.

At an administrative hearing held before the PTAB, both Riverwoods and the Review Board introduced written appraisals of the fair market value of Riverwoods' property. Riverwoods also presented the testimony of its appraiser. Both appraisals applied the three methods of valuation in calculating the fair market value of the property: the market data approach, the reproduction cost approach and the capitalization of net income approach.

At issue here is the proper method for calculating the fair market value of property under the capitalization of net income method of valuation. Under this approach, the fair cash value of property is determined by applying a capitalization rate to the property's estimated net annual income. There is no dispute concerning the proper capitalization rate. Rather, we are asked to determine whether the rent subsidy which Riverwoods receives under its contract with the government should be considered in estimating the net annual income of the apartment building.

Nicholas Muros, who prepared the appraisal submitted by Riverwoods at the hearing before the PTAB, testified that he did not take the government subsidy into account in estimating the net annual income of the apartment building for purposes of the income approach.

He explained that, in 1984, Riverwoods received an average monthly rent of $123 per apartment directly from tenants. In addition, Riverwoods received a substantial rental subsidy pursuant to a Federal subsidy agreement. Although the subsidy agreement is not part of the record, the trial court's memorandum states that the subsidy provides approximately 80% of Riverwoods' income. Muros stated that he did not consider the rent subsidy as part of the rental income on the property, because he viewed the subsidy as income earned from the government contract, rather than income earned by the property itself. Instead, he surveyed the average rent paid for comparable non-subsidized apartment units in the Kankakee area, and arrived at a gross potential rent figure of $300 to $350 per apartment, or a gross income of $457,800. He then adjusted this figure for vacancy losses and expenses, and arrived at a "net income" of $274,500. He then capitalized this figure at a rate of 11.8%, and arrived at a value of $2,326,271, which he rounded down to $2,325,000. As stated, Muros' report also developed estimates of value under the market data approach ($2,300,000) and under the reproduction cost approach ($2,325,000). He concluded, however, that the income approach produced the most accurate method of valuation. His final opinion that Riverwoods' property had a fair market value of $2,325,000 coincides with his estimate of value under the income approach.

Walter Stoutamoyer prepared the appraisal which the Review Board submitted to the PTAB. Although Stoutamoyer did not appear before the PTAB to explain his data or methodology, his appraisal indicates that he did consider the subsidy in estimating the net annual income of Riverwoods' property for purposes of the income approach. Accordingly, he determined that the property had a much higher fair market value of $5,900,000 under the net income approach. In applying the income ap-

proach, however, Stoutamoyer did not use the rent Riverwoods received from tenants plus the government subsidy as the gross income figure. Instead, he considered the rents paid at comparable properties in the Kankakee and Central Illinois areas. Although his appraisal does not state whether or not these comparable properties were subsidized, Riverwoods' attorney conceded that the properties Stoutamoyer considered were subsidized housing projects. Stoutamoyer estimated that Riverwoods received an average potential rent of $520 per month per apartment, and a potential gross annual income of $781,800. He then adjusted this figure for vacancy losses and expenses and arrived at a net income figure of $620,219. He then capitalized this figure at a rate of 10.5% and arrived at a value of $5,906,848, which he rounded down to $5,900,000. Although Stoutamoyer's appraisal considered the income approach, his value estimate was based almost exclusively upon the reproduction cost approach, under which the depreciated cost of the improvements to the land is added to the value of the land itself. His conclusion that Riverwoods' property had a fair market value of $6,665,875 coincided with his estimate of value under the reproduction cost approach. Stoutamoyer's appraisal also determined that Riverwoods' property had a value of $5,504,000 under the market data approach, although he disregarded this estimate of value as unreliable under the circumstances.

The PTAB adopted the appraisal that Muros prepared for Riverwoods and found the fair market value of the subject property was $2,325,000. The PTAB rejected Stoutamoyer's appraisal, stating that it relied too heavily upon the reproduction cost approach, which is not favored under decisions in our State in situations where the income and market approaches to determining value may be applied. The PTAB then concluded that Muros' use of market rent, rather than actual or contract rent,

in calculating the fair market value of Riverwoods' property was consistent with the principles set forth in *Springfield Marine Bank v. Property Tax Appeal Board* (1970), 44 Ill. 2d 428. The PTAB interpreted *Springfield Marine* as holding that property subject to an encumbrance which distorts the property's rental income above or below market value must be valuated as unencumbered. The PTAB therefore relied upon the appraisal introduced by Riverwoods as the best estimate of value and determined that the property had a fair market value of $2,325,000.

The trial court upheld the PTAB's decision. The Review Board argued that the PTAB erred when it relied upon an appraisal which did not consider the rent subsidy Riverwoods received from the government. The court stated, however, that the Review Board had failed to subpoena the subsidy contract or present any evidence before the PTAB regarding the terms of the agreement. The court found that it was virtually impossible for the PTAB to appraise the effect of the subsidy contract in the absence of any evidence as to its terms. The court also stated that the principles set out in *Springfield Marine* should be applied in cases such as this, where the encumbrance at issue increased, rather than decreased, the value of the property. The court thus concluded that Riverwoods' property should be valued apart from the subsidy agreement. The court finally concluded that the PTAB was justified in refusing to follow Stoutamoyer's appraisal in view of its undue emphasis on reproduction cost and that the PTAB's decision therefore was not against the manifest weight of the evidence.

The appellate court reversed. (163 Ill. App. 3d 811.) Although it did uphold the PTAB's adoption of the income approach as the most reliable method for determining fair market value in this case, the court reversed on the legal issue of what factors should be considered

when determining the fair market value of property under the income approach. Specifically, the court held that three types of rent should be considered in determining the fair market value of property under the income approach: "economic rent," that is, rent which the property would probably command in the open market; "restricted rent," rent actually paid by the tenants; and "contract rent," that is, the actual rent that property owners receive from tenants plus the rent subsidy they receive from the government. The court determined that all three types of rental income are entitled to consideration under the income approach, although no one amount may be controlling. The court observed that "economic," or market, rent is determined by analyzing the property at issue with reference to "comparable" properties. Because the record did not clearly show that the properties Muros considered were "comparable" to Riverwoods' property, or whether the economic rent of Riverwoods' property truly reflected its income-earning capacity, the court found no sound basis for the PTAB's adoption of Muros' appraisal. The court also concluded that the subsidy should be considered in determining the fair market value of Riverwoods' property because it would be considered by a willing and able buyer and seller, and because ignoring the subsidy would amount to a judicially mandated tax subsidy by the local government beyond that established by legislative policy. The court concluded that the PTAB erred as a matter of law in accepting a valuation approach, which the appellate court found "totally disregarded the subsidy aspects of the Riverwoods Apartments." 163 Ill. App. 3d at 818-19.

The Revenue Act states that real property shall be valued at one-third of its "fair cash value." (Ill. Rev. Stat. 1987, ch. 120, par. 501.) This court defined "fair cash value" as the price the property " 'would bring at a voluntary sale where the owner is ready, willing and able

to sell but not compelled to do so, and the buyer is ready, willing and able to buy but not forced so to do ***.' " (*Springfield Marine*, 44 Ill. 2d at 430, quoting *People ex rel. McGaughey v. Wilson* (1937), 367 Ill. 494, 496.) Although both parties agree that the income approach to valuation is a reliable indicator of the property's fair market value, they disagree regarding the proper method of calculating the gross income of subsidized property for purposes of this approach.

The Review Board argues that "contract rent," or the actual rent that Riverwoods receives from tenants plus the rent subsidy it receives from the government, should be used in calculating Riverwoods' gross annual income under the income approach. Riverwoods and the PTAB, on the other hand, argue that the "market rent," or that rent which the property would probably command on the open market as indicated by current rents being paid for comparable space, should be used in calculating Riverwoods' gross annual income under the income approach. Riverwoods argues that the PTAB's use of market rent, rather than contract rent, in calculating the fair market value of the subject property was consistent with the principles set forth in this court's opinion in *Springfield Marine Bank v. Property Tax Appeal Board* (1970), 44 Ill. 2d 428.

In *Springfield Marine*, the taxpayer's predecessor in title subjected the property to long-term leases which had approximately 10 years to run at the time of the court's decision. The value of the property had appreciated significantly after the leases were executed, so that the rent designated in the leases was substantially below that which could be obtained in the open market at the time the property was assessed. (44 Ill. 2d at 429.) The taxpayer contended that its property tax assessment was too high because it failed to reflect the unfavorable leases which diminished the property's rental income.

The PTAB refused to reduce the assessed valuation of the parcels. The trial court, however, concluded that the PTAB's decision was contrary to the manifest weight of the evidence and reduced the assessed valuation of the property to reflect the disadvantageous leases. On direct review, this court reversed, stating:

"It is clearly the value of the 'tract or lot of real property' which is assessed, rather than the value of the interest presently held by the owner. In determining the value of the property, rental income may of course be a relevant factor. [Citation.] However, it cannot be the controlling factor, particularly where it is admittedly misleading as to the fair cash value of the property involved." (44 Ill. 2d at 430-31.)

The court acknowledged that many factors may prevent a property owner from realizing an income return from property which accurately reflects its true earning capacity, but concluded that "it is the capacity for earning income, rather than the income actually derived, which reflects 'fair cash value' for taxation purposes." (44 Ill. 2d at 431.) The court accordingly reinstated the assessment approved by the PTAB and reversed the trial court's conclusion that the assessment was contrary to the manifest weight of the evidence.

Relying upon *Springfield Marine*, Riverwoods and the PTAB argue that "contract rent," or that rent that Riverwoods receives from tenants and pursuant to its contract with the government, must be disregarded in this case because it does not reflect the rent which the property would command in the open market. They argue that, instead, the income that property would generate in the open market absent the benefits or burdens of any of the current owner's contractual obligations should be considered in determining the fair cash value of property. They acknowledge the distinction between the unfavorable leases at issue in *Springfield Marine* and the fa-

vorable subsidy contract here. They argue, however, that the principles of *Springfield Marine* should apply with equal force to contracts which artificially inflate rents above, rather than below, market value. To hold otherwise, they argue, would penalize the competent and the diligent and reward the incompetent.

The Review Board responds that the principles set forth in *Springfield Marine* do not apply in this case, because the subsidy at issue is not an "encumbrance" but rather is rent which substantially benefits Riverwoods and so must be considered in the same manner that rent collected from tenants is considered in the income approach. It argues that Riverwoods' actual income must be considered because it reflects the property's income-earning capacity in the marketplace of subsidized housing. The Board argues that the subsidy reflects an agreement between Riverwoods and the government as to what this type of subsidized housing is worth in the open market.

*Amicus curiae*, the Lake County board of review, likewise argues that income-earning capacity of subsidized housing projects and the income which the owners of such housing actually derive are identical because the government controls the income earned by controlling the amount of rent that can be charged and the amount of the subsidy. *Amicus* argues that market-derived rent does not accurately reflect subsidized property's earning capacity, because such property is planned, built and operated outside the traditional marketplace. *Amicus* argues that a number of decisions from other jurisdictions hold that subsidy income must be considered in valuation. *Executive Square Limited Partnership v. Board of Tax Review* (1987), 11 Conn. App. 566, 528 A.2d 409; *Steele v. Town of Allenstown* (1984), 124 N.H. 487, 471 A.2d 1179.

Before we consider the merits of the parties' arguments, we must determine the appropriate standard of review. The PTAB is required by statute to conduct hearings and decide each case before it based upon equity and the weight of the evidence presented. (Ill. Rev. Stat. 1987, ch. 120, par. 592.4.) Its decisions are then subject to review under the provisions of the Administrative Review Law (Ill. Rev. Stat. 1987, ch. 110, par. 3—101 *et seq.*). The Act limits the scope of judicial review by providing that "[t]he findings and conclusions of the administrative agency on questions of fact shall be held to be *prima facie* true and correct." (Ill. Rev. Stat. 1987, ch. 110, par. 3—110.) Thus, the usual standard for judicial review of an administrative decision is whether it is contrary to the manifest weight of the evidence (*Commonwealth Edison Co. v. Property Tax Appeal Board* (1984), 102 Ill. 2d 443), and a court will not intervene in a case where there is simply a difference of opinion as to the actual value of property (*Board of Review v. Property Tax Appeal Board* (1982), 104 Ill. App. 3d 859; *In re Application of Aurand* (1980), 90 Ill. App. 3d 560). The Review Board contends, and the appellate court held, however, that this case involves an improper method of valuation rather than simply a difference of opinion as to the market value of Riverwoods' property. (See *Chrysler Corp. v. Property Tax Appeal Board* (1979), 69 Ill. App. 3d 207.) The Review Board argues that the PTAB erred in concluding that, under *Springfield Marine Bank v. Property Tax Appeal Board* (1970), 44 Ill. 2d 428, the value of Riverwoods' property had to be determined without considering the subsidy income Riverwoods receives pursuant to its contract with the government. Accordingly, we must determine whether the PTAB erred as a matter of law when it determined that the subsidy income Riverwoods receives pursuant to its contract with the government may not be considered

when determining the fair market value of Riverwoods' property for taxation purposes.

Riverwoods and the PTAB concede that the contract rent Riverwoods receives under the government subsidy contract is a relevant factor to "consider" in determining the fair cash value of property for tax purposes. They argue, however, that actual rent or contract rent must be disregarded where it does not accurately reflect rents obtainable in the open market for comparable property. They cite decisions from other jurisdictions which support the conclusion reached in *Springfield Marine* as authority for this argument. Riverwoods and the PTAB interpret *Springfield Marine* as holding that contract rent is irrelevant in determining the fair cash value of property where contract rent is not reflective of rents obtainable on the open market. Although we agree that the principles set out in *Springfield Marine* are relevant in this case, we disagree with the manner in which the PTAB applied those principles to the facts here.

*Springfield Marine* does not stand for the proposition that contract rent is irrelevant where it is different from market rent. Rather, that case simply held that, when property is subject to an unfavorable lease, the contract rent or actual rental income must be disregarded in determining the property's fair market value when the actual rental income does not reflect the property's capacity for earning income. Thus, under *Springfield Marine*, a property's income-earning capacity is the most significant element in arriving at "fair cash value." (*Springfield Marine*, 44 Ill. 2d at 431.) When actual rental income does not reflect the income-earning capacity of property, it may be disregarded, and the taxing authority may look to rents obtainable for comparable property in the open market. Where actual income truly reflects the income-earning capacity of the property, however, it may

not be ignored simply because it does not coincide with rents obtainable on the open market.

As stated, the standard for determining the fair market value of property is the price at which ready, willing and able buyers and sellers would agree. (*Springfield Marine*, 44 Ill. 2d at 431.) In this case, the rent subsidy that Riverwoods receives pursuant to its contract with the government enhances the property's income-earning capacity. A willing buyer would most certainly consider the guaranteed income rate set by the Federal government when determining the fair cash value of the property. To ignore actual income would be to ignore the effect of the subsidy on a prospective investor's judgment regarding the fair market value of the property. Because the rent subsidy Riverwoods receives pursuant to its contract with the government affects the earning capacity, and thus the fair cash value, of Riverwoods' property, we conclude that the PTAB erred as a matter of law in accepting a valuation that relied only on the rent the property would command in the open market of unsubsidized housing. A government subsidy contract that enhances the income-earning capacity of a particular piece of property must be considered in assessing the fair cash value of that property for taxation purposes.

We do not mean to suggest that the tax assessor, in applying the income approach to valuation, is limited to and must accept the actual rental figure under the government subsidy contract as the sole measure of projected income. In most cases, such an approach would lead to a distorted measure of fair cash value. Factors such as the transferability of the subsidy contract, the remaining term of the contract and restrictions on the amount of return on capital investment would certainly affect the value of the property. A valuation approach which considers the subsidy income, but does not consider the negative aspects of a subsidy agreement upon

the earning capacity of subsidized property, would be inappropriate. The taxing authority must weigh both the positive and the negative aspects of the subsidy agreement and adjust the actual income figure to accurately reflect the true earning capacity of the property in question. As stated, "it is the capacity for earning income, rather than the income actually derived, which reflects 'fair cash value' for taxation purposes." *Springfield Marine*, 44 Ill. 2d at 431.

In this regard, we note that the appraisal that the Review Board submitted to the PTAB did not use Riverwoods' actual income or the contract rent it receives under the subsidy agreement ($736 per month per apartment) in calculating the gross annual income of Riverwoods' property under the income approach. Rather, the appraisal compared Riverwoods' property to similar subsidized housing and calculated that the property had a potential gross income of only $520 a month per apartment, approximately $200 less than the rent Riverwoods actually receives pursuant to its contract with the government. The Review Board now claims, however, that Riverwoods' contract rent or actual income is equivalent to the property's income-earning capacity. There is no evidence in the record to support this contention. The evidence suggests only that the government subsidy enhances the income-earning capacity of Riverwoods' property, and should be considered in determining the fair cash value of Riverwoods' property. Accordingly, we do not hold that Riverwoods' actual income coincides with the property's income-earning capacity. We simply hold that the PTAB erred as a matter of law when it failed to consider the effect of the subsidy agreement on the income-earning capacity and thus the fair market value of Riverwoods' property. On remand, the PTAB must consider the effect which the subsidy agreement has upon the earning capacity of Riverwoods' property.

Riverwoods and the PTAB argue that the rental income that Riverwoods receives under the subsidy agreement should not be considered in valuating the property, because it is earned by virtue of Riverwoods' personal contract with the government, rather than by the property itself. They argue that any projected income figure which considers the rent subsidy values Riverwoods' interest in the property, rather than the earning capacity of the property. This court has held, however, that the fair cash value of property should be determined according to the use for which the property is designed and which produces its maximum income. In *State v. Illinois Central R.R. Co.* (1861), 27 Ill. 64, 67-68, this court stated:

> "Where property has a known and determinate value ***, there can be no difficulty [in fixing valuation]. But there are many kinds of property, as to which the assessor has no such satisfactory guide. Such is peculiarly the case with railroad property, and other similar property, constructed not only for the profit of the owners, but for the accommodation of the public, under the sanction and by the exercise of the sovereign power of the State. *In such cases, the inquiry should be, what is the property worth to be used for the purposes for which it is constructed,* and not for any other purpose to which it might be applied or converted, or for which it might be used. In such cases, if the property is devoted to the use for which it was designed, and is in a condition to produce its maximum income, one very important element for ascertaining its present value is discovered, and that is its net profits." (Emphasis added.)

In this case, the evidence shows that Riverwoods' property was designed for use as subsidized housing. The appraisers for both parties agreed that the best and highest use of the property is its current use as subsidized housing. Although the subsidy agreement is not part of the record on this appeal, there is no evidence to suggest

that a prospective purchaser could not also use the property as subsidized housing if it was sold on the open market today. Riverwoods' appraiser testified at the hearing before the PTAB that government subsidy contracts such as that at issue here are generally transferable to prospective purchasers with the consent of the government. Because the evidence suggests that the property is available to others for use as subsidized housing, and that the subsidy agreement affects the property's income-earning capacity, we conclude that the subsidy agreement must be considered when calculating the fair market value of Riverwoods' property.

Riverwoods and the PTAB urge this court to ignore the government subsidy, and to instead consider the rental income that the property would command in the open market of unsubsidized housing. Rents established in the market of unsubsidized housing, however, do not accurately reflect the earning capacity of subsidized housing, because subsidized housing is conceived, constructed and operated outside the forces of the traditional marketplace. Both parties agree that the market rents in the area would not have justified building the project and that the project would not have been feasible without the government subsidies. The subsidy enhances the earning capacity of government subsidized housing above market levels to provide owners with an incentive to build low-income housing. Thus, the subsidy cannot be ignored in determining the earning capacity, and thus the fair cash value, of subsidized housing.

Several other jurisdictions have likewise concluded that rental subsidies must be considered in calculating the fair cash value of government subsidized housing. See *Executive Square Limited Partnership v. Board of Tax Review* (1987), 11 Conn. App. 566, 528 A.2d 409; *Steele v. Town of Allenstown* (1984), 124 N.H. 487, 471 A.2d 1179. But see *Canton Towers, Ltd. v. Board of Re-*

*vision* (1983), 3 Ohio St. 3d 4, 444 N.E.2d 1027 (where the Ohio Supreme Court held that rents obtainable for comparable unsubsidized housing in the open market, rather than actual rental income, were properly used to calculate the gross annual income of subsidized housing under the income approach to valuation).

Riverwoods and the PTAB next contend that a valuation approach which considers the effect of a government subsidy agreement upon the fair market value of subsidized housing would violate the constitutional guarantee of uniformity of taxation set forth in article IX, section 4, of the Illinois Constitution of 1970 (Ill. Const. 1970, art. IX, §4). They argue that it violates the principle of uniformity to consider the actual rental income when valuating Riverwoods' property and subsidized housing in general, while valuating all other property according to rents charged for comparable property in the open market. Article IX, section 4(a), of the Constitution of 1970 provides:

"Except as otherwise provided in this Section, taxes upon real property shall be levied uniformly by valuation ascertained as the General Assembly shall provide by law."

The principle of uniformity of taxation requires equality in the burden of taxation. (*People ex rel. Hawthorne v. Bartlow* (1983), 111 Ill. App. 3d 513, 520.) This court has held that an equal tax burden cannot exist without uniformity in both the basis of assessment and in the rate of taxation. (*Apex Motor Fuel Co. v. Barrett* (1960), 20 Ill. 2d 395, 401.) The uniformity requirement prohibits taxing officials from valuating one kind of property within a taxing district at a certain proportion of its true value while valuating the same kind of property in the same district at a substantially lesser or greater proportion of its true value. *Apex Motor Fuel Co. v. Barrett*

(1960), 20 Ill. 2d 395, 401; *People ex rel. Hawthorne v. Bartlow* (1983), 111 Ill. App. 3d 513, 520.

We reject Riverwoods' claim that consideration of the subsidy agreement in assessing the fair market value of subsidized housing violates the rule of uniformity. The principle of uniformity of taxation requires that similar properties within the same district be assessed on a similar basis. (*Apex Motor Fuel Co. v. Barrett* (1960), 20 Ill. 2d 395, 401.) The cornerstone of uniform assessment is the fair cash value of the property in question. As stated, a property's income-earning capacity is an important factor in determining its fair cash value. (*Springfield Marine*, 44 Ill. 2d at 431.) Thus, uniformity is achieved only when all property with the same income-earning capacity and fair cash value is assessed at a consistent level. In most instances, the income-earning capacity and fair cash value of unsubsidized property may be accurately determined with reference to rents charged for comparable property in the open market. Market rents, however, do not necessarily reflect the income-earning capacity of subsidized property. The subsidy agreement must be considered to determine the true income-earning capacity, and thus the true value, of subsidized property. Riverwoods did not present any evidence to show that consideration of the subsidy agreement will cause its property to be assessed at anything other than one-third of its fair cash value. Failure to consider the subsidy agreement would permit subsidized property to be taxed at less than its fair cash value, in violation of the principle of uniformity.

Riverwoods also argues that the Review Board violated the rule of uniformity because it overassessed its property in relation to other comparable subsidized properties. As support of this argument, Riverwoods claims that the Review Board valued its property at $63,812 per unit, whereas two other subsidized apartment com-

plexes in the Kankakee area were valued at $14,108 and $21,230 per unit respectively. The taxpayer who objects to an assessment on the basis of lack of uniformity bears the burden of proving the disparity of assessment valuations by clear and convincing evidence. (*People ex rel. Costello v. Lerner* (1977), 53 Ill. App. 3d 245, 251.) Riverwoods failed to sustain their burden of proof in this case. There is no evidence in the record to suggest that the two subsidized projects are comparable to Riverwoods' property. Nor is there evidence showing that Riverwoods will be required to bear a disproportionately greater tax burden than owners of other comparable subsidized properties if the subsidy agreement is considered in calculating the fair market value of their property. Riverwoods cannot establish a lack of uniformity in taxation or a violation of constitutional rights by simply asserting that the Review Board determined that their property had a greater actual value than other subsidized properties. See *People ex rel. Hawthorne v. Bartlow* (1983), 111 Ill. App. 3d 513.

Riverwoods finally argues that consideration of the subsidy revenue when determining the value of Riverwoods' property for property tax purposes will result in double taxation in violation of article IX, section 4, of the Illinois Constitution (Ill. Const. 1970, art. IX, §4). Riverwoods asserts that the subsidy revenue is taxed as income and therefore should not be subject to an additional *ad valorem* property tax. It adds that a government rent subsidy is an intangible asset which cannot properly be subject to taxation as real property. This court has held that double taxation means " 'taxing twice, for the same purpose, in the same year, some of the property in the territory in which the tax is laid, without taxing all of it a second time.' " (*People ex rel. Hanrahan v. Caliendo* (1971), 50 Ill. 2d 72, 83-84, quoting *People ex rel. Toman v. Advance Heating Co.* (1941), 376 Ill. 158, 163.) The

subsidy income at issue in this case is not real property, nor is it taxed as such. Rather, the subsidy revenue, like the rent paid by tenants, is simply used to determine the fair market value of Riverwoods' property under the income approach to valuation. The fact that Riverwoods pays income tax upon the subsidy revenue does not prohibit the taxing authority from considering that revenue when calculating the fair market value of Riverwoods' property for taxation purposes. Because the subsidy is not taxed as both income and as real property, we reject Riverwoods' double taxation claim.

We hold that the PTAB erred as a matter of law in failing to consider the effect of the subsidy agreement upon the income-earning capacity, and thus the fair market value, of Riverwoods' property for taxation purposes. Accordingly, we affirm the judgment of the appellate court.

*Nos. 66396 & 66397 — Appellate court affirmed.*

JUSTICE CALVO took no part in the consideration or decision of this case.