THE TOWN OF CUNNINGHAM, Plaintiff-Appellant, v. PROPERTY TAX APPEAL BOARD *et al.*, Defendants-Appellees.

Fourth District   No. 4—91—0357

Opinion filed January 31, 1992.

LUND, J., specially concurring.

Frederic M. Grosser, of Champaign, for appellant.

Roland W. Burris, Attorney General, of Springfield (Rosalyn B. Kaplan, Solicitor General, and John A. Morrissey, Assistant Attorney General, of Chicago, of counsel), for appellee Property Tax Appeal Board.

Arvey, Hodes, Costello & Burman, of Chicago (Eugene L. Griffin, Jerome A. Siegan, and Larry C. Jurgens, of counsel), for appellee Carson Pirie Scott & Company.

JUSTICE STEIGMANN delivered the opinion of the court:
Plaintiff, the Town of Cunningham, appeals from an order of the circuit court, affirming a decision of the Property Tax Appeal Board (PTAB) concerning the assessed valuation of a shopping mall in Urbana, Illinois. The issue presented on appeal is whether a taxing authority should consider the contract sale price and rent when determining the assessed valuation of the property when the rent does not reflect market rates because of the unique financing nature of the transactions.
We affirm.

I. FACTS
In 1964, Carson Pirie Scott & Company (Carsons) developed the Lincoln Square shopping center in Urbana with one of its stores serving as the anchor store. In 1987, Carsons sold the mall and leased back the space occupied by its store from the buyer. Although it initially listed the property for $6 million with a lease-back provision for $200,000 to $250,000 per year for 10 to 15 years, Carsons eventually sold the mall for $9.3 million with a $615,000-per-year lease back for 15 years. Under this arrangement, Carsons received more cash up front, even though it would pay more rent in the following 15 years. By selling the property for more than the market price, Carsons in effect received extra cash somewhat akin to a loan. Carsons would repay this "loan" by paying a higher rent in the years to come. Most important for Carsons, it received this surplus cash without incurring debt on its balance sheets.
Later that year, the Town of Cunningham assessor determined the value of the mall for property taxes at $3,100,000 based on an appraised market value of $9.3 million, the sale price. Carsons filed a complaint with the Champaign County Board of Review (Board of Review), which affirmed the assessment. During this appeal, the property was assessed in 1988 at a value of $3,044,200, based on the $9.3 million sale price adjusted for market changes in the year since the

sale. The Board of Review, however, set the assessed value at $2,677,180, based on a fair market value of $8,600,000. Carsons then appealed both decisions to the PTAB.

At the PTAB hearing, the Town of Cunningham, which had intervened in the proceedings, conceded that the 1987 sale price of $9.3 million, upon which the original assessment was based, exceeded the fair market value of the property. Both parties also agreed that the rent of $650,000 exceeded the true market rate to accommodate for the increased sale price. Though both parties submitted appraisals based on all three methods of property appraisal (market comparison, income potential, and cost reconstruction), both parties agreed that the income approach best reflected the true market value of a shopping mall.

Two differences separated the parties in their appraised values. First, simply as a matter of estimation, they arrived at substantially different appraised market values for 1987 under the income approach. Carsons' appraiser valued the mall at $5,830,000, while the township's appraiser valued the mall at $7,633,000 based on a comparison of the income that comparable properties produced.

The second difference focuses on the township appraiser's consideration of the excess rent. While Carsons' appraiser ignored the excess rent because it did not reflect market rates, the township's appraiser considered the excess rent as additional income generated by the mall. Based on his appraisal of $7,633,000, the township's appraiser calculated that Carsons paid $191,500 in excess rent over the market rate. Capitalizing this figure at a rate of 20%, the appraiser finally valued the mall at $8.59 million for 1987. This compared with Carsons' appraiser's assessed value of $5.83 million at a capitalization rate of 11%. Both appraisers agreed that the value of the property increased about 5% in 1988.

After hearing this evidence, the PTAB found for Carsons and revalued the assessment according to Carsons' appraisal. On administrative review, the circuit court remanded the case to the PTAB with directions that it consider the effect of the Illinois Supreme Court's recent decision in *Kankakee County Board of Review v. Property Tax Appeal Board* (1989), 131 Ill. 2d 1, 544 N.E.2d 762, filed after the PTAB had rendered its decision. On remand, the PTAB reaffirmed its prior decision and distinguished *Kankakee County* from the present case because *Kankakee County* involved government rent subsidies for apartment buildings. The circuit court affirmed and the Town of Cunningham appeals.

## II. Standard Of Review

■ Defendants argue that we must accept the PTAB's findings as *prima facie* correct and that we can reverse only if the PTAB's conclusions are against the manifest weight of the evidence. In support, they cite *Lake County Board of Review v. Property Tax Appeal Board* (1989), 192 Ill. App. 3d 605, 548 N.E.2d 1129, and *Gas Research Institute v. Department of Revenue* (1987), 154 Ill. App. 3d 430, 507 N.E.2d 141. However, unlike those cases, this appeal does not require us to determine the correct value of the mall property. Instead, it requires us to address the appropriate factors that the PTAB should consider when it determines that value. Accordingly, we address this legal question without giving any deference to the PTAB's conclusions on the matter. *Kankakee County*, 131 Ill. 2d at 14-15, 544 N.E.2d at 768; *Lake County*, 192 Ill. App. 3d at 613-14, 548 N.E.2d at 1134-35; *Gas Research*, 154 Ill. App. 3d at 433, 507 N.E.2d at 143.

## III. Contract Rent And Price Used To Determine Market Rent And Price For Tax Assessments

■ The Revenue Act of 1939 requires that the taxing authority assess real estate taxes at one-third the fair cash value of the subject property. (Ill. Rev. Stat. 1989, ch. 120, par. 501(1).) The Illinois Supreme Court has held that "fair cash value" means " 'what the property would bring at a voluntary sale where the owner is ready, willing and able to sell but not compelled to do so, and the buyer is ready, willing and able to buy but not forced so to do ***.' " (*Springfield Marine Bank v. Property Tax Appeal Board* (1970), 44 Ill. 2d 428, 430, 256 N.E.2d 334, 336, quoting *People ex rel. McGaughey v. Wilson* (1937), 367 Ill. 494, 496, 12 N.E.2d 5, 6.) The appraisals presented to the PTAB focused on determining the fair market value of the subject property through the three methods of valuation, focusing specifically on the income approach because that approach best reflected what the market would bear for commercial property.

■ The present case requires us to address whether the assessment should consider the actual contract sale price and the contract rent when they do *not* reflect the market values because of the particular nature of the financing in the sales contract. In *Springfield Marine Bank*, the supreme court held that "[i]n determining the value of the property, rental income may of course be a relevant factor. [Citation.] However, it cannot be the controlling factor, particularly where it is admittedly misleading as to the fair cash value of the property involved." (*Springfield Marine Bank*, 44 Ill. 2d at 430-31, 256 N.E.2d

at 336.) The court further held that the actual rent did not reflect market value because the parties had fixed the rent in 1952 and the property had substantially increased in value since then. (*Springfield Marine Bank*, 44 Ill. 2d at 431, 256 N.E.2d at 336.) Accordingly, the court held that the assessment should not consider the actual rent. *Springfield Marine Bank*, 44 Ill. 2d at 431, 256 N.E.2d at 336.

PTAB has misconstrued the *Springfield Marine Bank* holding by viewing it as standing for the proposition that contract rent is irrelevant when determining the market value of property. For instance, in two independent but factually similar cases before PTAB, the owner of a government-subsidized apartment building received more than the market rate for similar nonsubsidized apartments. (See *Kankakee County*, 131 Ill. 2d at 7-8, 544 N.E.2d at 764-65; *Lake County Board of Review v. Property Tax Appeal Board* (1988), 172 Ill. App. 3d 851, 853, 527 N.E.2d 84, 85.) Although the rent the tenants paid fell below market rates, government subsidies inflated the actual rent above market rates. PTAB ruled in those cases that *Springfield Marine Bank* dictated that the *market* rate for comparable, nonsubsidized apartments should determine the tax assessment rather than the actual, contract rent. See *Kankakee County*, 131 Ill. 2d at 15-16, 544 N.E.2d at 768-69; *Lake County*, 172 Ill. App. 3d at 856-57, 527 N.E.2d at 87.

Both the Second District Appellate Court and, later, the Illinois Supreme Court disagreed, and the supreme court wrote the following:

> "*Springfield Marine* does not stand for the proposition that contract rent is irrelevant where it is different from market rent. Rather, that case simply held that, when property is subject to an unfavorable lease, the contract rent or actual rental income must be disregarded in determining the property's fair market value when the actual rental income does not reflect the property's capacity for earning income. \*\*\* When actual rental income does not reflect the income-earning capacity of property, it may be disregarded, and the taxing authority may look to rents obtainable for comparable property in the open market. Where actual income truly reflects the income-earning capacity of the property, however, it may not be ignored simply because it does not coincide with rents obtainable on the open market." (*Kankakee County*, 131 Ill. 2d at 15-16, 544 N.E.2d at 768.)

Plaintiff, the Town of Cunningham, contends that *Kankakee County* applies to the present case in that, even though the rent paid by Carsons does not reflect the market rent, the tax assessment should con-

sider it. It argues that the PTAB erred as a matter of law when it wrote that "it is fair to conclude from a reading of *Kankakee County* that consideration of actual rents is only applicable to subsidized housing cases." At first blush plaintiff's argument is not without appeal. Nevertheless, on further study, we conclude that although the decision in *Kankakee County* is firmly based in the context of government subsidized housing, that decision discusses basic legal principles of property valuation that direct us to affirm the decision of the circuit court and PTAB.

In *Kankakee County*, the court held that the assessor should have considered the effect the government subsidy contract had on the income-earning capacity of a particular piece of property. (*Kankakee County*, 131 Ill. 2d at 19, 544 N.E.2d at 770.) However, the supreme court noted that "the standard for determining the fair market value of property is the price at which ready, willing and able buyers and sellers would agree." *Kankakee County*, 131 Ill. 2d at 16, 544 N.E.2d at 768, citing with approval *Springfield Marine*, 44 Ill. 2d at 431, 256 N.E.2d at 334.

In this case, both parties agree that the actual rent paid by Carsons exceeded the market rental value of the property. The source of this surplus rent, however, is not the real property itself, or the specific use of the property in the community. (See *Kankakee County*, 131 Ill. 2d at 18-19, 544 N.E.2d at 770 (restricting consideration of the property's use to subsidized housing).) The surplus rent paid by Carsons represented the cost of receiving a cash infusion of $3.3 million in excess of the market value of the property from the buyer. However, property taxes should be based on the income-generating capacity of the bricks and mortar of the property, not any financing arrangements of the particular seller, which became the lessee and the new owner. (See *Springfield Marine*, 44 Ill. 2d at 431, 256 N.E.2d at 336 ("[I]t is the capacity for earning income, rather than the income actually derived, which reflects 'fair cash value' for taxation purposes").) Therefore, the PTAB correctly held that the appraisal of the mall property should not have included the actual rent paid by Carsons because that rent substantially reflected neither the actual income potential nor the true market rent. We agree with the PTAB's conclusion that "unlike the subsidized housing situation in *Kankakee County*, the additional income over economic or market rent is not due to the earning capacity of the real estate, but rather is due to the particular nature of the contract between the parties."

We can explain our conclusion in another way: assume that Carsons had not needed the extra $3.3 million but decided as a financial

strategy to be a lessee rather than an owner. Accordingly, we can assume that Carsons would have sold the property at or about its initial listed price of $6 million, in which case we would not be addressing the issue of surplus rent. The difference between this hypothetical situation and reality is the financial condition and strategies of Carsons, *not* any factor relating to the property itself. We reject the notion that an assessed valuation can be in any way dependent upon the microeconomics of the financing arrangements of the parties to the sale of the property or of a particular occupant of a property.

Accordingly, we affirm.

Affirmed.

McCULLOUGH, J., concurs.

JUSTICE LUND, specially concurring:

I specially concur only to warn those who consider this opinion to not miss the forest because of the trees. Some pretty fancy financing was going on with Carson Pirie Scott & Company in fiscal years 1986 and 1987.

There was a plan to concentrate on retailing. The 1987 annual report discusses liquidation of the catering and food business, while adding the Minnesota-based Donaldson's department stores. County Seat specialty stores were also being added. Financing was a major concern.

The increase in sale price from $6 million to $9,300,000 resulted in an increase of almost $400,000 in annual rent payments for 15 years. If the annual $400,000 was paid at the rate of $33,333 per month, the monthly payment would come very close to liquidating a 15-year $3,300,000 note carrying a 9% interest rate.

The tax effects of such transactions are complicated, but are necessary corporate considerations. These considerations have little to do with the fair market value of, and the reasonable rental return from, real estate investments.