# Illinois Official Reports

## Appellate Court

---

### *LOMTO Federal Credit Union v. 6500 Western LLC*, 2018 IL App (1st) 173106

---

| | |
|---|---|
| Appellate Court Caption | LOMTO FEDERAL CREDIT UNION, Plaintiff, v. 6500 WESTERN LLC; CHICAGO TAXI LEASING, INC.; TAXI TOWN, INC.; UNKNOWN OWNERS and NONRECORD CLAIMANTS, Defendants (Michael J. Eber, Receiver-Appellee; 6500 Western LLC, Chicago Taxi Leasing, Inc., and Taxi Town, Inc., Defendants-Appellants). |
| District & No. | First District, First Division<br>Docket No. 1-17-3106 |
| Filed | April 23, 2018 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 17-CH-05789; the Hon. Darryl B. Simko, Judge, presiding. |
| Judgment | Order vacated and cause remanded. |
| Counsel on Appeal | Cohon Raizes & Regal LLP, of Chicago (Cornelius P. Brown and Caroline K. Kwak, of counsel), for appellants.<br><br>Carlson Dash, LLC, of Chicago (Kurt M. Carlson and Steven D. Mroczkowski, of counsel), for appellee. |

JUSTICE HARRIS delivered the judgment of the court, with opinion. Presiding Justice Pierce and Justice Mikva concurred in the judgment and opinion.

**OPINION**

¶ 1    This appeal involves an interlocutory order, granting the receiver's motion to increase rent, determine market value rental rates of property, and employ a real estate valuation professional. On appeal, defendants, 6500 Western LLC, Chicago Taxi Leasing, Inc. (Chicago Taxi), and Taxi Town, Inc. (Taxi Town), contend the court erred in (1) permitting an increase in rent pursuant to section 15-1704(g) of the Illinois Mortgage Foreclosure Law (735 ILCS 5/15-1704(g) (West 2016)), when a lease agreement exists, and (2) permitting an increase to the market rental rates for the property. For the following reasons, we vacate the order and remand for further proceedings consistent with this opinion.

¶ 2                                JURISDICTION

¶ 3    The trial court entered an interlocutory order, granting the receiver's motion on November 21, 2017. Defendants filed their notice of appeal on December 15, 2017. Accordingly, this court has jurisdiction pursuant to Illinois Supreme Court Rule 307(a)(3) (eff. Nov. 1, 2017), governing interlocutory appeals as of right.

¶ 4                                BACKGROUND

¶ 5    The property at issue is located at 6500 N. Western Avenue in Chicago, Illinois. The commercial property is improved with a 28,200-square-foot building used by defendants, Chicago Taxi and Taxi Town. On April 21, 2017, plaintiff LOMTO Federal Credit Union filed its commercial foreclosure action against defendants. On May 10, 2017, plaintiff filed a motion for immediate possession and appointment of a receiver.

¶ 6    Adrian Tudor, the manager of 6500 Western LLC, is also president of both Chicago Taxi and Taxi Town. On or about June 1, 2017, 6500 Western LLC executed leases with Chicago Taxi and Taxi Town for "that portion of the premises *** currently occupied by the Tenant(s)." Under each lease, the tenant pays $4000 per month as rent, and the lease term expires on May 31, 2022. The lease agreements contain no provision for a security deposit or for payment of utilities, and the landlord is responsible for maintenance and repairs during the lease term. The combined rent from these leases is $8000 per month, which is approximately $3.40 per improved square foot per year.

¶ 7    On June 16, 2017, the trial court granted plaintiff's motion for immediate possession and to appoint a receiver. On July 24, 2017, the receiver sent a letter to 6500 Western LLC listing the estimated monthly expenses of the property per month, including $11,822 for property taxes, $935.26 for insurance, $2000 for snow removal and landscaping, $2000 for repairs to the roof and sewer/drainage systems, and $2000 placed in a capital repair reserve escrow. This total estimated cost of $18,758.03 per month did not include utilities the landlord may be responsible for under the lease agreements. The receiver informed 6500 Western LLC that the $8000 per month received in rent "is not sufficient to cover the expenses and it leaves no cash

available to pay current debt service (principal and interest payments) nor any reasonable rate of return." According to preliminary market rate data gathered by the receiver, a more appropriate monthly rent would total $37,600 per month.

¶ 8    On August 7, 2017, the receiver filed his first report, which included the detailed monthly cost estimates in the July 24, 2017, letter. The court approved the report and on September 6, 2017, the receiver filed his motion to increase rent, determine market value rental rates of property, and employ a real estate valuation professional. In the motion, the receiver set forth the monthly landlord costs of the property listed in his first report, but added $3506.38 for utility payments for a total of $22,264.41 per month. The motion requested that the trial court "enter an order raising the rent, on an interim basis, to be paid by Taxi Town, Inc. and Chicago Taxi Leasing, Inc., to an aggregate amount that is sufficient to cover maintenance, repair and operation of the property on a monthly basis."

¶ 9    The receiver also requested that the court enter an order to allow for "a real estate valuation professional to determine market-based rental rates for the Property and subsequently hold a hearing to determine whether rental rates shall be adjusted to market rate or kept at operating cost levels." In support, the receiver filed an affidavit of Brent L. Burden, a licensed real estate broker. Burden measured the 6500 N. Western Avenue property against two comparable commercial properties in the area using Costar, a "widely accepted *** industry standard tool for conducting research related to commercial property rentals and sales." Property located at 6100 N. Clark Street, when used as an auto dealership, had a rental rate of $18.56 annually per square foot, triple net. The property at 6017 N. Western Avenue, which has been used as an auto dealership and taxi parking lot, had starting rental rates of $19 annually per square foot, triple net. Triple net pricing "refers to a common industry standard where *** the tenant is responsible for paying 1) property taxes; 2) building insurance; and, 3) any common area maintenance during the lease term. These costs are paid in addition to the rent." Therefore, "[g]ross rental rates are usually higher than those calculated on a triple net basis because [in those cases] the landlord pays property taxes, insurance, and maintenance costs out of the rent received from the tenant."

¶ 10    Burden found that in the lease agreements signed by Chicago Taxi and Taxi Town, "the tenants appear to be responsible solely for the payment of a flat rental rate and the landlord pays property taxes, insurance, and maintenance costs for the Property. This equates to approximately $3.43 annually per square foot, gross," which "falls substantially below market value." In his opinion, the rental rates of the 6500 N. Western Avenue property "fall in the range of $14 to $18 annually per square foot, triple net."

¶ 11    In response, defendants argued that section 15-1704(g) does not allow a receiver to seek an increase in rent when a lease agreement already exists and, alternatively, that the receiver did not meet his burden in order to increase the rent. After hearing oral argument, the trial court granted the receiver's motion and allowed him to increase the rental rates "to the rates specified in the Affidavit, to wit, $14/square foot to $18/square foot annually, triple net." The court denied the receiver's request for retroactive application of his motion and ordered that the increased rates take effect on the day of the order, November 21, 2017. Defendants timely appealed.

¶ 12                                    ANALYSIS

¶ 13          On appeal, defendants contend the trial court erred in allowing the receiver to increase rents because section 15-1704(g) only authorizes an increase when a party is occupying property without a lease agreement, and Chicago Taxi and Taxi Town are paying rent pursuant to lease agreements. When construing a statute, the primary goal is to ascertain and give effect to the legislature's intent as reflected in the plain and ordinary meaning of the statutory language itself. *People v. Lloyd*, 2013 IL 113510, ¶ 25. "A court must view the statute as a whole, construing words and phrases in light of other relevant statutory provisions and not in isolation." *People v. Perez*, 2014 IL 115927, ¶ 9. Likewise, a court must give effect to every word, clause, and sentence of a statute if possible, and no part should be rendered superfluous. *Id.* The court may also "consider the reason for the law, the problems sought to be remedied, the purposes to be achieved, and the consequences of construing the statute one way or another." *Id.* We review questions of statutory construction *de novo. Evanston Insurance Co. v. Riseborough*, 2014 IL 114271, ¶ 13.

¶ 14          Section 15-1704(g), titled "Increase of rents," provides:

          "Notwithstanding any other provision of this Article, a receiver shall not charge an occupant of the mortgaged real estate *a rental amount above that which the occupant had been paying for use and occupancy* of the mortgaged real estate prior to the appointment of a receiver without leave of court. The court may allow an increase of rent if, upon motion by the receiver, the court finds by a preponderance of the evidence, that the increase of rent is necessary to operate, manage, and conserve the mortgaged real estate pursuant to this Section. *** Nothing in this subsection (g) shall alter the terms of any lease agreement." (Emphasis added.) 735 ILCS 5/15-1704(g) (West 2016).

¶ 15          Defendants argue that the emphasized phrase limits the occupants subject to increased rents to those who are paying for use and occupancy, and does not include occupants who signed lease agreements. Although "use and occupancy" is not defined in the statute, defendants point to its use in section 9-201 of the Forcible Entry and Detainer Act (*id.* § 9-201(2)) as guidance. Section 9-201 states that when "lands are held and occupied by any person without any special agreement for rent," landowners may recover rent "or a fair and reasonable satisfaction for the use and occupation thereof." *Id.* Since section 9-201 involves the recovery of rent for "use and occupation" in cases where no lease agreement exists, defendants contend that the phrase "use and occupancy" in section 15-1704(g) also refers only to persons occupying property without a lease agreement.

¶ 16          We disagree. Although defendants cite cases where no lease agreement exists and "the law implies a promise on the part of the occupant to pay *** for use and occupation thereof" (internal quotation marks omitted) (*Board of Directors of the Warren Boulevard Condominium Ass'n v. Milton*, 399 Ill. App. 3d 922, 926 (2010)), payment under "rental agreements" and payment for "use and occupancy" are not mutually exclusive. Generally, "rent" has been " 'defined as the recompense for the use and occupancy of lands,' " regardless of whether an agreement exists between the parties. *Chicago Housing Authority v. Bild*, 346 Ill. App. 272, 276 (1952) (involving a lease agreement between the parties) (quoting *Stein v. Stely*, 32 S.W. 782, 783 (Tex. Civ. App. 1895)). In fact, the phrase "use and occupancy" as it pertains to rental agreements can be found in the Evanston City Code as well as the Chicago Municipal Code. Section 5-3-2(A) of the Evanston City Code defines "rental agreement" as "A

written agreement *** embodying the terms and conditions concerning the use and occupancy of a dwelling unit and premises." Evanston City Code § 5-3-2(A) (Jan. 23, 2002). Likewise, section 5-12-030 of the Chicago Municipal Code states that " 'Rental agreement' means all written or oral agreements embodying the terms and conditions concerning the use and occupancy of a dwelling unit by a tenant." Chicago Municipal Code § 5-12-030(a) (amended May 12, 2010).

¶ 17    Also, "[w]e must examine the [statutory] language as a whole and consider each part or section in connection with every other part or section." *Northwest Diversified, Inc. v. Mauer*, 341 Ill. App. 3d 27, 36 (2003). Section 15-1704 sets forth the powers and duties of receivers appointed by the court. According to the plain language of the statute, receivers "shall have full power and authority to operate, manage and conserve" the subject property, including the collection of "rents, issues and profits from the mortgaged real estate." 735 ILCS 5/15-1704(b)(2) (West 2016). Subsection (c) specifically lists duties of the receiver in managing the property. However, these duties only apply "to the extent the receiver receives sufficient receipts from the mortgaged real estate." *Id.* § 15-1704(c). Subsection (g) provides that in cases where receipts from the property prove insufficient, the receiver may file a motion showing an "increase of rent is necessary to operate, manage, and conserve the mortgaged real estate pursuant to this Section." *Id.* § 15-1704(g).

¶ 18    Reading section 15-1704 as a whole, the receiver has "full power and authority to operate, manage and conserve" the mortgaged real estate by using receipts from the property, and subsection (g) allows the receiver to seek an increase in rent if the receipts prove insufficient for him to perform his duties. Nothing in the statutory language indicates an intent to allow increases only from occupants who pay rent without a lease agreement. Rather, limiting the application of subsection (g) in such a manner defeats the legislature's intent, since the receiver's ability to obtain receipts necessary to operate, manage, and conserve the property would be restricted. Courts will not read into a statute limitations or conditions that depart from the legislature's intent as indicated by the plain meaning of the statutory language. *Northwest Diversified, Inc.*, 341 Ill. App. 3d at 36. Furthermore, under defendants' interpretation if all the occupants of a property had lease agreements, subsection (g) would have no application whatsoever. "[C]ourts must give effect to every word, clause, and sentence and may not read a statute so as to render any part inoperative, superfluous, or insignificant." *Newland v. Budget Rent-A-Car Systems, Inc.*, 319 Ill. App. 3d 453, 456 (2001).

¶ 19    Defendants also contend that subsection (g) applies only to occupants without lease agreements because it uses the word "occupant" rather than "lessee," and a party under a lease agreement is generally referred to as a "lessee." As further support, defendants point to the last sentence of the provision, which states that "[n]othing in this subsection (g) shall alter the terms of any lease agreement." 735 ILCS 5/15-1704(g) (West 2016). They argue that raising rents can only apply to parties without lease agreements because such an increase would alter the terms of an existing lease contrary to the intent stated in the last sentence.

¶ 20    First, we disagree with defendants' interpretation of "occupant" in subsection (g). Throughout section 15-1704, "occupant" is used to describe all parties who occupy a dwelling unit in the mortgaged real estate without limitation. See *id.* § 15-1704(c)(2.5) (the receiver "shall accept all rental payments from an occupant"); *id.* § 15-1704(f)(1) (the receiver shall identify "all occupants of dwelling units of the mortgaged real estate"); *id.* § 15-1704(f)(2) ("the appointed receiver shall notify all known occupants of dwelling units"). The term

"lessee" appears only once, in subsection (b)(1), which provides that the receiver shall have the authority to "secure tenants and execute leases for the real estate" and that "nothing in this Section shall affect the legal rights of any lessee with respect to the safety and habitability of the residential real estate." *Id.* § 15-1704(b)(1). The fact that "lessee" is used only in the subsection specifically dealing with the execution of leases by the receiver, but "occupant" is used throughout the rest of the section to describe any party dwelling in a unit of the mortgaged property, indicates that the legislature intended for the remaining provisions of section 15-1704 to encompass all occupants of the property regardless of whether a lease agreement exists.

¶ 21 Additionally, increasing rents pursuant to subsection (g) does not alter the terms of defendants' existing lease agreements. Section 15-1704(g) was in effect when the parties executed their lease agreements. "[C]ontracting parties are presumed to have entered into the contract with a knowledge of the existing law as it relates to their agreement," and by operation of law, such "laws, statutes and ordinances become implied terms of the contract." *S&D Service, Inc. v. 915-925 W. Schubert Condominium Ass'n*, 132 Ill. App. 3d 1019, 1023 (1985). Since the lease agreements did not specifically exclude the effect of subsection (g), defendants are deemed to have accepted this provision as an implied term of their agreements. *Id.* The subsection's last sentence merely reflects this rule of law by stating that an increase in rent pursuant to this statutory provision does not alter the terms of any lease agreement.

¶ 22 For these reasons, we find that section 15-1704(g) allows the receiver to seek an increase in rent from defendants through leave of court.

¶ 23 Alternatively, defendants contend that if subsection (g) allows the receiver to seek an increase in their rent, the trial court exceeded its authority when it allowed an increase to the market rental rate without evidence to support such an increase. Subsection (g) authorizes the court, upon motion by the receiver, to allow an increase in rent an occupant has been paying if it finds by a preponderance of the evidence that the increase "is necessary to operate, manage, and conserve the mortgaged real estate pursuant to this Section." 735 ILCS 5/15-1704(g) (West 2016). It follows that the increased rate must be an amount "necessary to operate, manage, and conserve" the property.

¶ 24 To determine the appropriate rate pursuant to subsection (g), we look at the plain language of the statute. Section 15-1704, which grants the receiver "full power and authority to operate, manage and conserve" the property (*id.* § 15-1704(b)), also specifies in subsections (c) and (d) the receiver's duties and how receipts from the mortgaged property shall be allocated. Subsection (c) provides that the receiver "must manage the mortgaged real estate as would a prudent person," and in managing the property, the receiver shall maintain casualty and liability insurance, "use reasonable efforts to maintain the real estate *** in at least as good condition as existed at the time the receiver took possession," accept all rental payments, "apply receipts to payment of ordinary operating expenses," and pay any shared or common expenses. *Id.* § 15-1704(c). The receiver may also make other repairs and improvements necessary to comply with building codes, "hold receipts as reserves reasonably required for the foregoing purposes," and take actions "reasonably necessary to conserve the mortgaged real estate." *Id.* To perform these duties, the receiver uses receipts received from the property. Subsection (d) provides that the receiver shall first use receipts to reimburse the receiver and for payments of insurance premiums and various fees. *Id.* § 15-1704(d). After making those payments, the receiver applies the remaining receipts to expenses listed in subsection (c). *Id.*

¶ 25    Reading section 15-1704 as a whole, we find that subsections (c) and (d) set forth the receiver's duties in operating, managing, and conserving the mortgaged real estate. Therefore, since subsection (g) allows an increase in rent above the amount that the occupants had been paying only if "necessary to operate, manage, and conserve" the property, any increase allowed must be necessary for the receiver to perform his duties as set forth in subsections (c) and (d).

¶ 26    The trial court below allowed an increase "to the rates specified in the Affidavit, to wit, $14/square foot to $18/square foot annually, triple net." However, as stated by Brent Burden in his affidavit, this rate is the market value rate. His affidavit contains no statements regarding an appropriate rate given the costs, expenses, and fees outlined in subsections (c) and (d).

¶ 27    Market value rental rate is not synonymous with the rental rate necessary to cover operating costs and expenses incurred in managing a property. Rather, the market value rate is " 'the amount a willing lessee will pay a willing lessor, in a voluntary transaction, for the right to use and occupy the premises.' " *Monroe Dearborn Ltd. Partnership v. Board of Education of the City of Chicago*, 271 Ill. App. 3d 457, 463 (1995) (quoting *People ex rel. Korzen v. American Airlines, Inc.*, 39 Ill. 2d 11, 18 (1967)). Although such a rate presumably covers the lessor's operating costs and expenses, it also reflects "the property's capacity for earning income." *Kankakee County Board of Review v. Property Tax Appeal Board*, 131 Ill. 2d 1, 15 (1989). Section 15-1704(g) provides that the court may increase the rent occupants had been paying prior to the appointment of the receiver, but only if it finds the increased rent "is necessary to operate, manage, and conserve the mortgaged real estate." 735 ILCS 5/15-1704(g) (West 2016). Nothing in the plain language of subsection (g) allows for an increase to the market value rental rate if that rate exceeds the amount the receiver needs to perform his duties under the statute.

¶ 28    Our interpretation is further supported when we compare section 15-1704(g) to section 15-1704(b)(1). Section 15-1704(b)(1) provides that the receiver has the authority to secure tenants and execute new leases "the duration and terms of which are reasonable and customary for the type of use involved." *Id.* § 15-1704(b)(1). Unlike section 15-1704(g), subsection (b)(1) does not limit the rental rate to one that is necessary to operate, manage, and conserve the property. This distinction makes sense. The receiver, given his "full power and authority to operate, manage, and conserve" the property, should be able to execute new leases for the market value rental rate. It is also reasonable to limit the receiver's authority to increase the rent of occupants who have been paying rent pursuant to existing leases, and to limit such increases to the amount necessary to operate, manage, and conserve the property even if the market rate is higher. "[S]tatutes should be construed to give them a reasonable meaning and to avoid absurdity or hardship." *Hearne v. Chicago School Reform Board of Trustees of the Board of Education for the City of Chicago*, 322 Ill. App. 3d 467, 476 (2001).[1]

¶ 29    Here, the receiver specified the monthly operating costs of 6500 N. Western Avenue—including property taxes, insurance, and utilities—as $22,264.41. Adding the

[1]On appeal, the receiver challenges the validity of the leases Chicago Taxi and Taxi Town executed and argues whether subsection (g) has any application as a result. However, this is an interlocutory appeal with a limited scope of review. *People v. Johnson*, 208 Ill. 2d 118, 145 (2003). Illinois Supreme Court Rule 307(a)(3) (eff. Nov. 1, 2017) limits our consideration to the "giving or refusing to give other or further powers or property to a receiver *** already appointed."

interest on unpaid property taxes, which continues to accrue at approximately $2129.09 monthly, the monthly expenses total $24,393.50, or approximately $10.38 annually per square foot, triple net. We note that this amount does not include the fees incurred by the receiver, for which he must be reimbursed pursuant to subsection (d). Still, it is substantially less than the market rate of $14 to $18 annually per square foot allowed by the trial court pursuant to Burden's affidavit. Therefore, we vacate the court's order allowing an increase in rent to the market value rate, and remand for proceedings to determine an appropriate increase as authorized by section 15-1704(g).

¶ 30    For the foregoing reasons, we affirm the trial court's determination that section 15-1704(g) allows the receiver to seek an increase of rent from occupants who have lease agreements, but vacate the trial court's order allowing an increase to market value rental rates. We remand the cause for proceedings consistent with this opinion.

¶ 31    Order vacated and cause remanded.